Matthew R. Mendelsohn
David M. Freeman
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Telephone: (973) 228-9898
Facsimile: (973) 228-0303

Todd S. Garber (*pro hac vice* forthcoming)
Bradley F. Silverman (*pro hac vice* forthcoming)
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
445 Hamilton Avenue
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561

*Attorneys for Plaintiff and Putative Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMY BURD, individually, and on behalf of a class of similarly situated individuals,<br><br>        Plaintiff,<br><br>    v.<br><br>SUBARU OF AMERICA, INC.; SUBARU CORPORATION<br><br>        Defendant. | **No.:**<br><br><br>**CLASS ACTION COMPLAINT**<br>**AND JURY TRIAL DEMAND** |

Plaintiff Amy Burd, a resident of Union County, New Jersey, brings this action against

Defendants Subaru of America, Inc. and Subaru Corporation (collectively "Defendants" or

"Subaru"), by and through her attorneys, individually and behalf of all others similarly situated

("Class Members"), and allege as follows:

## INTRODUCTION

1.      Defendants manufactured, distributed, marketed, warranted, sold and leased

model years 2016 through 2019 Subaru Outback vehicles and 2019 through 2020 Subaru Ascent vehicles ("Class Vehicles") with electrical systems that are defective in material and/or workmanship resulting in battery drain that often leaves the battery dead. ("Defect" or "Electrical Defect").

2.      The Defect—which can manifest at any time, in any location, and in any weather condition—causes an inability to start the Class vehicle rendering it incapacitated and stranding owners, which poses a serious risk to the health and safety of owners and their passengers.

3.      Plaintiff Amy Burd, who owns 2017 Subaru Outback, is informed and believes that Subaru knew or should have known about the Defect in the Class Vehicles and various other Subaru vehicles since 2014. Nevertheless, Subaru failed to disclose the Defect to prospective class members at the time of sale or lease and thereafter.

4.      Indeed, Plaintiff is informed and believes and based thereon alleges that as the number of complaints about the Defect increased, on or about June 9, 2014, Subaru quietly acknowledged the existence of the Defect to only their dealers in a Service Information Bulletin ("SIB"), Number 07-85-14. (SIB 07-85-14 is attached to this Complaint at Exhibit "A.") In SIB 07-85-14 Subaru concedes that Subaru owners and lessees have expressed "concerns of batteries going dead over a period of time." To remedy this problem, SIB 07-85-14 instructs dealers on the procedure to determine and identify what is causing the "Parasitic Battery Draw."

5.      However, while Defendant issued SIB 07-85-14 to their dealers in 2014, it remains in effect and therefore also covers the Class Vehicles.

6.      On or about August 8, 2017, Subaru issued Technical Service Bulletin

("TSB") Number 11-174-17R, which revised a June 15, 2017 TSB, to among other things, address complaints of "battery discharge (dead battery) after repeated periods of short-trip driving." (A copy of TSB 11-174-17R is attached to this Complaint as Exhibit "B")

7.    On or about November 16, 2017, Subaru issued a Technical Service Bulletin ("TSB") Number 11-176-17 to address continued customer reports of battery issues. The TSB 11-176-17 is applicable to the 2016 Subaru Outback Class Vehicles (and others) and was implemented to "result in improved battery life." (A copy of TSB 11-176-17 is attached to this Complaint as Exhibit "C")

8.    Despite Subaru's knowledge of the Electrical Defect and its efforts to address the issue through the issuance of SIBs and TSBs, owners and lessees of the Class Vehicles continue to suffer from the Electrical Defect and are frequently left with a dead battery.

9.    Nonetheless, contrary to their obligations under clearly-established law, Subaru distributed and sold Class Vehicles to unsuspecting consumers without notifying them that the Defect even existed, much less offer to repair the resulting problems without cost to the owner if the problem manifested itself outside of the Class Vehicles' limited 3 year/36,000 mile warranty, as Subaru knew it would. Consequently, Plaintiff and members of the proposed class have been—and continue to be—exposed to a serious safety hazard and continue to bear the cost of repairs necessitated by the Defect on their own.

10.    Accordingly, Plaintiff brings this action individually and on behalf of all other individuals who owned or leased a Class Vehicle for the purpose of requiring Subaru to (1) notify all members of the proposed class of the nature and impact of the Electrical Defect, (2) reimburse proposed class members who have paid to fix the Defect, and (3) repair the Defect free of charge, and for compensatory, statutory, and punitive damages.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1332(d)(2) and (6) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant Subaru of America, Inc. has its headquarters in this jurisdiction, transacts business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.   Additionally, Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

13.     This Court has personal jurisdiction over Defendants.  Defendants' North American corporate headquarters is located in Camden, New Jersey.  As such, Defendants have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the districts of New Jersey and throughout the United States.

**NEW JERSEY LAW SHOULD APPLY**

14.     To the extent that it is appropriate to engage in a choice of law analysis for purposes of deciding any motion to dismiss that may be filed by Subaru, New Jersey's substantive laws should apply.

15.     New Jersey's substantive laws may be constitutionally applied to the claims herein under the Due Process Clause, 14th Amendment, § 1, and the Full Faith and Credit Clause, Art. IV., § 1, of the U.S. Constitution.   New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class Members. To the extent that it is appropriate to engage in a choice of law analysis for purposes of deciding any motion to dismiss that may be filed by Subaru, New Jersey's substantive laws should apply because Plaintiff properly brings this Complaint in this District, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

16.     Specifically, Defendants' North American headquarters and principal place of business is located in New Jersey.  Defendant Subaru of America, Inc. is also registered with the New Jersey State Business Gateway Service.

17.     Defendants also owns property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in New Jersey and avail themselves of New Jersey's laws renders the application of New Jersey law constitutionally permissible.

18.     A substantial number of Class Members also reside in New Jersey and purchased their vehicles in New Jersey.

19.     Upon information and belief, New Jersey is also the state from which Defendants' misconduct emanated.  This conduct similarly injured and affected Plaintiff and all Class Members residing in the United States.  For instance, Defendants' marketing and advertising efforts, warranty and goodwill policies and procedures, and maintenance schedules and recommendations were all likely created in and orchestrated from the location of Subaru's present headquarters in New Jersey.  As a result, New Jersey is where the conduct causing

injury to the Plaintiff and Class Members occurred and from where it emanated.

20.     The application of New Jersey's laws is also appropriate under New Jersey's choice of law rules because New Jersey has significant contacts to the claims of the Plaintiff and the proposed Class, and New Jersey has a greater interest in applying its laws here than any other interested state.

## THE PARTIES

21.     Plaintiff Amy Burd is a citizen of Union County, New Jersey who purchased a 2017 Subaru Outback on or about August 23, 2016, primarily for personal, family, or household purposes.

22.     Defendant Subaru of America, Inc. is an automobile manufacturing, marketing, sale, leasing, distribution, servicing and warranting corporation that maintains its headquarters and principle place of business in Camden, New Jersey.  Subaru of America, Inc. is a subsidiary of Defendant Subaru Corporation, which is a Japanese multinational corporation with its principal place of business located in Tokyo, Japan.  Subaru Corporation designs, develops, manufactures and distributes vehicles bearing the Subaru name, including the Class Vehicles, in United States and worldwide.

23.     At all times relevant herein, Defendant Subaru of America, Inc. was engaged in the business of importing, distributing[1], selling, leasing, servicing, repairing, marketing and warranting automobiles in New Jersey and throughout the United States of America.

24.     At all times relevant herein, Defendant Subaru Corporation was engaged in the business of designing, manufacturing, shipping and marketing automobiles intended for sale and/or lease in New Jersey and throughout the United States of America.

---

[1] Subaru of America, Inc. distributed the Class Vehicles to Subaru authorized dealers throughout the United States.  These dealers subsequently sold and leased the Class Vehicles to prospective Class Members in the United States.

## TOLLING OF STATUTES OF LIMITATION

25.     Because the Electrical Defect cannot be detected until after it manifests, Plaintiff and the members of the proposed class were not reasonably able to discover the problem until after purchasing or leasing the Class Vehicles, despite their exercise of due diligence.

26.     Plaintiff and the members of the proposed class had no realistic ability to discern that the electrical system was defective until the batteries in their vehicles prematurely failed.  Therefore, the discovery rule is applicable to the claims asserted by Plaintiff and the members of the proposed class.

27.     Based on the publicly available information Plaintiff has discovered, it is clear that Defendants have known about the Electrical Defect since 2014 at the latest and have concealed from or failed to alert owners and lessees of the Class Vehicles about the defective nature of their electrical systems.

28.     Any applicable statute of limitation has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein.  Defendants are further estopped from relying on any statute of limitation because of their concealment of the defective nature of the Class Vehicles and their electronic air suspension.

## FACTUAL ALLEGATIONS

29.     Defendant Subaru of America, Inc brought model year 2016 Class Vehicles to market in 2015 and continued selling them to prospective class members through the 2020 model year without disclosing the existence, nature, or scope of the Electrical Defect.  This Defect causes electrical system overdraw power resulting in battery drain that often leaves the battery dead, and the Class Vehicle unable to be started.

### A. THE DEFECT POSES A SAFETY HAZARD

30.     The Electrical Defect creates a serious safety hazard, including causing an inability to start the Class Vehicle rendering it incapacitated and stranding owners. When the battery dies it also renders many safety features in the vehicle inoperable, including things like hazard lights and headlights, making it more likely that a stranded vehicle is struck by another vehicle.

31.     Plaintiff is informed and believes that Defendants have been aware of the Defect since 2014 at the latest.  Despite the obvious safety risk that it posed, however, Defendants failed and refused to disclose the existence, nature, or scope of the Defect to Plaintiff, to the members of the proposed class, or to any other purchaser of an affected Class Vehicle throughout the United States.  As a result of this failure, Plaintiff and the proposed class have been put at risk of a looming safety hazard without knowing it, and have been forced to bear the cost of repairs that become necessary when the Defect manifests.

32.     Plaintiff is informed and believes that many of the Class Vehicles have experienced the Defect thereby creating a safety hazard.

33.     As reflected by complaints to the National Highway Traffic Safety Administration ("NHTSA") and on the internet, an extraordinary number of purchasers and lessees of the Class Vehicles have experienced dead batteries as a result of the Defect.  Those complaints reveal that the Defect is widespread, dangerous and that it manifests without warning.

34.     Upon information and belief, Defendants regularly monitor both NHTSA's website and internet forums to monitor complaints being made about Subaru vehicles.

35.     The complaints also indicate Defendants' awareness of the problems with the

electronic systems, the costs associated with the necessary repairs, and how the Defect poses a safety issue for consumers. The following are examples of consumer complaints on the internet or to NHTSA that have been posted on its website concerning the Defect which relate to Electrical Defect (spelling and grammar mistakes remain as found in the original) (Safecar.gov, *Search for Complaints* (March 20, 2020), http://www-odi.nhtsa.dot.gov/complaints/):

NHTSA Complaints

> October 20, 2017
> Components: ELECTRICAL SYSTEM
> NHTSA ID Number: 11035118
> Incident Date October 7, 2017
> Consumer Location ARLINGTON, WA
> Vehicle Identification Number 4S4BSACC5H3****
> Vehicle: 2017 Subaru Outback
> Summary of Complaint
> TL* THE CONTACT OWNS A 2017 SUBARU OUTBACK. THE CONTACT STATED THAT THE VEHICLE FAILED TO START AT 7:00 AM IN THE MORNING WITHOUT WARNING. THE VEHICLE WAS TOWED TO THE DEALER (DWAYNE LANE'S ARLINGTON CHEVROLET, 20410 SMOKEY POINT BLVD, ARLINGTON, WA 98223) WHERE IT WAS DIAGNOSED THAT THE WIRING HARNESS NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS NOT CONTACTED. THE APPROXIMATE FAILURE MILEAGE WAS 18,000. *BF
>
> **********************************************************************
>
> October 26, 2017
> Components: ELECTRICAL SYSTEM
> NHTSA ID Number: 11040055
> Incident Date October 23, 2017
> Consumer Location Unknown
> Vehicle Identification Number 4S4BSAKC2H3****
> Vehicle: 2017 Subaru Outback
> Summary of Complaint
> 7,180 MILEAGE, PURCHASED NEW 12-2016. GARAGED KEPT, 80 DEGREE TEMP. WE BOTH ARE 70 + YEARS, SAFETY RELIABILITY ARE MAJOR CONSIDERATIONS. ON 10-21-17, WE MADE A 20 MILE GROCERY TRIP. AUTO DROVE AS USUAL. ON 10-23-17, WE HAD M.D. APPOINTMENT. STARTER WOULDN'T TURN MOTOR OVER. ORIGINAL BATTERY CAME WITH THE

CAR, HAD ZERO ELECTRICAL ENERGY LEFT...I CONNECTED MY BATTERY CHARGER TO THE BATTERY POSTS, WAITED 10 MINUTES. DASH LIGHTS CAME ON, MOTOR STILL WOULDN'T TURN OVER. CHARGED BATTERY AN ADDITIONAL 30 MINUTES, AND SWITCHED CHARGER MODE TO 50 AMP 'START' MODE, STARTER MOTOR SLOWLY TURNED, AND MOTOR STARTED. MADE THE 60 MILE TRIP TO M.D'S OFFICE, AND BACK HOME, AND WHEN ARRIVING HOME, FOUND OUT THAT THE PASSENGER NOR DRIVER'S ELECTRIC WINDOW WOULDN'T OPEN, TO GET MAIL FROM OUR MAIL BOX. ON 11/26/17 I TOOK THE CAR TO SUBARU OF JACKSONVILLE. THREE HOUR WAIT AT DEALER, EVEN WITH AN APPOINTMENT. THE WARRANTY REPAIR WAS LISTED AS ECM UPDATE. DEALER'S WORK ORDER COPY RE. WINDOWS WAS " ALL SYSTEMS OPERATING AS DESIGNED." SERVICE DEPARTMENT MENTIONED THAT THERE MAY BE AN ADDITIONAL UPDATE REQUIRED.  WITH OUR LAST COUPLE OF G.M. CARS, VARIOUS "UPDATES OR ADJUSTMENTS" WERE MADE VIA SATELLITE.  THIS TECHNOLOGY IS CERTAINLY AVAILABLE...WITH BLUETOOTH PERHAPS, THROUGH CELL PHONE?  I MADE THE 30+ MILE TRIP FROM THE DEALER HOME TO ST. AUGUSTINE WITHOUT FURTHER PROBLEMS.

************************************************************************

September 12, 2018
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11129170
Incident Date August 23, 2018
Consumer Location BEREA, OH
Vehicle Identification Number 4S4BSAHC7H3****
Vehicle: 2017 Subaru Outback
Summary of Complaint
TWICE SINCE PURCHASED MARCH 2017 ELECTRICAL FAILURES HAVE CAUSED ALL DASHBOARD WARNING LIGHTS TO GO ON; STABILITY CONTROL, ANTI-LOCK, VARIOUS DRIVER AIDS HAVE CEASED TO OPERATE, AND ENGINE POWER WAS SEVERELY REDUCED (ALTHOUGH CAR STILL RAN). FIRST FAILURE WAS RECTIFIED WITHIN A FEW DAYS, BUT CURRENT FAILURE HAS HAD THE CAR AT THE DEALER FOR A MONTH WITH NO PROSPECT OF A REPAIR. CAR WAS RUNNING AT THE TIME OF EACH FAILURE. DEALER IS SAYING THE MANUFACTURER IS TRYING TO DESIGN A WIRING HARNESS OR INSTRUMENT CLUSTER THAT WILL WORK, BUT BACKORDERS ARE PILING UP ACROSS THE COUNTRY AND HE HAS NO PROMISE TO GIVE ME. I'M CURIOUS ABOUT HOW LONG I MUST WAIT BEFORE I ASK THE DEALER TO REPLACE THE ENTIRE CAR WITH ONE THAT DOES WORK.

************************************************************************

November 15, 2018

Components: ELECTRICAL SYSTEM, UNKNOWN OR OTHER
NHTSA ID Number: 11151647
Incident Date November 12, 2018
Consumer Location ISSAQUAH, WA
Vehicle Identification Number 4S4BSANC2J3****
Vehicle: 2018 Subaru Outback
Summary of Complaint
2018 SUBARU OUTBACK: PER DEALER: ORIGINAL BATTERY "BAD" &
REPLACED BY DEALER AFTER IT FAILED (UNABLE TO START & WON'T
HOLD CHARGE) AFTER 10,500 MILES AT 9 MO. BATTERY ALSO FAILED IN
OUR PREVIOUSLY OWNED 2015 OUTBACK AFTER ONLY 3 WEEKS, & IN A
2015 SUBARU LEGACY AFTER 35 MONTHS. THE 2018 OUTBACK'S TOUCH
SCREEN (& BACK-UP CAMERA SCREEN, ETC) HAS ALSO STOPPED
WORKING TWICE, AT ABOUT 2 MONTHS (WHILE BACKING OUT OF THE
DRIVEWAY) & AGAIN AT 3 MONTHS, BOTH TIMES SUDDENLY, THE SCREEN
GOING BLACK FOR A MINUTE OR LONGER, & THEN TURNING WHITE FOR
SEVERAL MINUTES BEFORE RESUMING THE NORMAL SCREEN
CONFIGURATION & APPEARANCE.

**********************************************************************

March 5, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11184252
Incident Date February 7, 2019
Consumer Location RESTON, VA
Vehicle Identification Number 4S4WMALD0K3****
Vehicle: 2019 Subaru Ascent
Summary of Complaint
THE BATTERY KEEPS DYING WHEN I HAVE THE TAILGATE (TG) OPENED
FOR EXTENDED PERIODS OF TIME SUCH AS WHEN DOG TRAINING. THE
FIRST TIME MY BATTERY DIED, I WAS THE LAST PERSON ON THE
TRAINING GROUNDS. I CLOSED THE TG AND LIGHTS WERE FLASHING AND
BEEPING FOR A FEW MINUTES. THE BATTERY DIED AND THE TG WAS
SHUT AND WOULDN'T OPEN. I PANICKED B/C I COULD NOT GET MY DOGS
OUT AND I WAS ALONE IN A VAST WOODED AREA. THIS IS A TERRIBLE
SAFETY ISSUE B/C IF I DID NOT HAVE CELL PHONE COVERAGE THAT DAY,
MY DOGS WOULD'VE BEEN TRAPPED IN THE CAR WITHOUT WATER AND I
WOULD HAVE HAD TO WALK A VERY LONG WAY TO GET HELP SINCE THE
SUBARU ROADSIDE ASSISTANCE WILL NOT WORK WITHOUT CELL
COVERAGE.
IN FEB., I WAS DOG TRAINING IN AREAS OF GEORGIA WHERE THERE IS NO
CELL PHONE COVERAGE. THREE DAYS IN A ROW, MY BATTERY DIED.
FORTUNATELY, ANOTHER MEMBER OF OUR GROUP JUMP STARTED THE
CAR. THE LOCAL DEALER IN TALLAHASSEE WAS SHOCKED TO HEAR
THAT LEAVING THE TAILGATE OPEN WOULD DRAIN THE BATTERY.

SUBARU SAYS THIS IS HOW THE CAR WAS DESIGNED. IN ADDITION TO INSTALLING A NEW BATTERY, THEY INSTALLED A BATTERY DISCONNECT SWITCH, WHICH I PURCHASED TO PREVENT MY BATTERY FROM DYING. EVERY TIME YOU FLIP THE SWITCH TO CUT THE BATTERY OFF, ALL THE PRESETS GO BACK TO DEFAULT AND HAVE TO BE RESET. AND NOW RANDOMLY ALL THE WARNING LIGHTS NOW COME ON AND THE EYESIGHT SYSTEM FAILS B/C SUPPOSEDLY THE SYSTEM IS SENSING A DROP IN VOLTAGE WHEN THE BATTERY DISCONNECT SWITCH IS BEING USED.

IT SEEMS TO ME THAT SUBARU DIDN'T THINK THIS THROUGH GIVEN THAT THEY MARKET TO THE OUTDOORSY TYPE OF PERSON, DOG OWNERS AND CAMPERS.

THEY NEED SOME SORT OF FIX TO CORRECT THIS SAFETY ISSUE TO ALLOW OWNERS TO TURN OFF THE POWER TO THE TG WHEN NEEDED SO THEY ARE NOT LEFT STRANDED WHEN THEY ARE 'OFF THE GRID" AS THEIR COMMERCIALS TOUT.

*************************************************************************

May 9, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11206412
Incident Date May 4, 2019
Consumer Location BURR RIDGE, IL
Vehicle Identification Number 4S4WMARD7K3****
Vehicle:2019 Subaru Ascent
Summary of Complaint
THE BATTERY DRAINS ALL THE TIME LOCKING THE REAR HATCH. YOU CAN NOT ACCESS THE CAR FROM THE REAR. IF DOGS ARE CRATED IN THE REAR THEY ARE STUCK & THIS CAN BE DANGEROUS. I HAD TO CLIMB THROUGH THE REAR SEAT UNHOOK SEVERAL ANCHORS THAT HOLD THE CRATES DOWN, TRY TO MANEUVER ONE SIDE WAYS SO AS TO GET THE DOOR TO OPEN TO GET THE DOG OUT. IF IT WAS HOT OUT OR AN EMERGENCY, THIS COULD HAVE BEEN A SERIOUS ISSUE. IT TOOK ABOUT 20 MIN. TO GET THIS DONE. THERE IS NO OVERRIDE ON THIS PARTICULAR VEHICLE. THE DEALER SAID ITS THE WAY IT IS. UNTIL THE BATTERY GETS JUMPED OR CHARGED, YOU CAN'T GET IN THE REAR HATCH.

*************************************************************************

June 4, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11217905
Incident Date April 1, 2019
Consumer Location TRAVERSE CITY, MI
Vehicle Identification Number 4S4WMARD5K3****

Vehicle: 2019 Subaru Ascent
Summary of Complaint
I ATTEMPTED TO START MY SUBARU ASCENT AND IT WOULD NOT START.
I CONTACTED SUBARU'S TOWING AND THEY CAME AND JUMPSTARTED
THE CAR. THE TOWING COMPANY INFORMED ME THAT SUBARU'S ASCENT
BATTERIES ARE DEFECTIVE AND THAT THEY HAVE BEEN FORCED TO
JUMP A NUMBER OF THEM. I DROVE TO WORK. THE NEXT MORNING, I
WOKE TO THE SAME PROBLEM. I CALLED SUBARU'S TOWING SERVICE,
AND THEY CAME OUT AGAIN. I TOOK THE CAR TO THE DEALERSHIP AND
THEY TESTED THE BATTERY, BUT THE BATTERY DID NOT EXHIBIT FAIL
CODES. SUBARU WOULD NOT REPLACE THE BATTERY, DESPITE THE TWO
FAILURES. SINCE THIS TIME, I'VE HAD MULTIPLE BATTERY FAILURES AND
SUBARU CONTINUES TO DENY MY REQUEST FOR REPLACEMENT.

************************************************************************

June 15, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11220366
Incident Date April 19, 2019
Consumer Location BERKLEY, MA
Vehicle Identification Number N/A
Vehicle: 2017 Subaru Outback
Summary of Complaint
CAR DOES NOT START BAD BATTERY

************************************************************************

July 31, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11240959
Incident Date July 27, 2019
Consumer Location FORT COLLINS, CO
Vehicle Identification Number 4S4WMAPD5K3****
Vehicle: 2019 Subaru Ascent
Summary of Complaint
WE HAD A SERIOUS ELECTRICAL MALFUNCTION OF OUR NEW 2019
SUBARU ASCENT THAT HAPPENED ON JULY 27,2019 AT APPROXIMATELY
11 AM. THE VEHICLE WAS PARKED IN OUR DRIVEWAY IN THE SUN. THE
TEMPERATURE WAS APPROXIMATELY 95 DEGREES.WE LOADED OUR
DOGS IN THE REAR OF THE SUBARU ASCENT IN METAL WIRE CRATES.WE
THEN CLOSED THE HATCHBACK USING THE BUTTON AND THE MOTOR
FUNCTIONED PROPERLY TO CLOSE THE HATCHBACK COMPLETELY. MY
WIFE THEN GOT INTO THE DRIVER SEAT OF THE VEHICLE AND
ATTEMPTED TO START THE CAR WITH THE PUSHBUTTON START. THE
STARTER CLICKED ON AND THE ENGINE TURNED OVER ONCE BUT DID

NOT START. SHE THEN PRESSED THE START BUTTON AGAIN WITH NO RESPONSE WHATSOEVER FROM THE VEHICLE. THE DASHBOARD WARNING LIGHTS STARTED FLASHING RANDOMLY. THE MAIN LCD SCREEN IN THE CENTER CONSOLE TURNED BLANK AND THEN REAPPEARED IN THE HOME SCREEN. NO OTHER ELECTRICAL SYSTEMS WERE FUNCTIONAL. SPECIFICALLY WE COULD NOT OPEN THE REAR HATCH NOW AS IT IS ELECTRICALLY MOTOR DRIVEN AND THERE IS NO WAY FROM THE OUTSIDE TO MECHANICALLY OPEN THE HATCH.

THIS IS A NEW 2019 SUBARU ASCENT THAT WAS PURCHASED APPROXIMATELY 2 MONTHS PRIOR AND HAS ONLY 1500 MILES ON IT.MY WIFE ATTEMPTED TO USE THE STARLINK HELP BUTTON INSIDE THE VEHICLE BUT THAT DID NOT WORK.I DISCONNECTED THE BATTERY CABLES FROM THE BATTERY FOR A LITTLE OVER A MINUTE AND A HALF. I THEN TRIED RECONNECTING THE BATTERY CABLES AND RESTARTING THE CAR BUT NOTHING WORKED.THE CAR WOULD NOT START EVEN WITH JUMPER CABLES ATTACHED. NONE OF THE ELECTRICAL SYSTEMS WERE FUNCTIONAL WITH THE JUMPER CABLES ATTACHED.I HAD TO OBTAIN A BOLT CUTTER AND CUT THE CRATE APART TO BRING THE ANIMALS OUT. I NOTIFIED A MY SUBARU DEALER OF THIS PROBLEM. THEY HAD US BRING THE CAR INTO THEIR DEALERSHIP ON MONDAY JULY 29.THEY STATED THEY RAN DIAGNOSTICS AND ACTUALLY TALKED TO THE SUBARU SUPPORT FROM CORPORATE AND COULD NOT FIND ANY DEFECT IN THE VEHICLE. NO FIX WAS DONE

*************************************************************************

August 28, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11252033
Incident Date August 24, 2019
Consumer Location LIMERICK, PA
Vehicle Identification Number 4S4BSACCXH3****
Vehicle: 2017 Subaru Outback
Summary of Complaint
MY VEHICLE, WHILE STATIONARY WITHOUT ANYTHING PLUGGED IN OR RUNNING (I.E. AC), HAS THE BATTERY DIE. THE VEHICLE IS A 2018, AND THIS HAPPENED 08/24/2019. I BELIEVE A BATTERY TO BE A MAINTENANCE ITEM, BUT BEING LESS THEN 2 YEARS OLD UNDER "NORMAL" USE IS CONTRARY TO INDUSTRY OR MANUFACTURER STANDARDS, WHICH I BELIEVE THE UNEXPECTED TIMING AND NATURE CREATES A SAFETY ISSUE. I REPLACED THE BATTERY, AND FOUND THIS TO BE A COMMON ISSUE WITH SUBARU'S; HOWEVER, NEVER RECEIVED ANY ADVISEMENT OR NOTIFICATION FROM THE COMPANY.

*************************************************************************

September 11, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11254696
Incident Date September 10, 2019
Consumer Location TIGARD, OR
Vehicle Identification Number 4S4BSANC5H3****
Vehicle: 2017 Subaru Outback
Summary of Complaint
BATTERY DEAD SEVERAL TIMES. HAVE HAD TO HAVE IT JUMPED SIX
TIMES. BATTERY REPLACED BY DEALER ONCE. I NOTE THAT MANY
SUBARU OWNERS HAVE SIMILAR PROBLEM.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

September 8, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11254012
Incident Date June 21, 2019
Consumer Location PORTLAND, OR
Vehicle Identification Number 4S4WMAPD6K3****
Vehicle: 2019 Subaru Ascent
Summary of Complaint
OUR ASCENT HAS BEEN DYING SINCE JUNE, WHICH WAS ALMOST A YEAR
FROM THE DAY WE BOUGHT IT BRAND NEW (FIRST ASCENT SOLD BY OUR
DEALER). IT HAS LOST TOTAL POWER ABOUT 7-8 TIMES NOW AND WE'VE
HAD IT TOWED TO OUR SUBARU DEALER THREE TIMES. THE FIRST TIME
THEY SAID IT WAS A DEFECTIVE BATTERY AND GAVE US A NEW
BATTERY. THE SECOND TIME THE DEALER PERSON SAID THERE WAS NO
PROBLEM AND BLAMED ME FOR LEAVING ONE OF THE INTERIOR LIGHTS
ON OVERNIGHT THUS DRAINING THE BATTERY. THE THIRD TIME THEY
KEPT THE CAR FOR ABOUT A WEEK AND AFTER THAT THEY SAID IT WAS
SOME SORT OF A LOOSE CABLE AND THAT THEY HAD FIXED THE
PROBLEM. SINCE THEN THE CAR HAS DIED TWO MORE TIMES. THE FIRST
ONE WHEN MY HUSBAND WAS CAMPING WITH THE KIDS (WHICH HAS
HAPPENED BEFORE WHILE CAMPING BECAUSE OF THE OPENING AND
CLOSING OF DOORS) BUT LUCKILY HE HAD A "JUMP STARTER KIT" WHICH
WE HAD ACQUIRED AFTER FEW TIMES AFTER OUR CAR DIED. AND, THAT I
MUST ADD THAT IT IS A TOOL THAT SHOULD COME WITH EVERY ASCENT!
THE LAST TIME WAS TODAY. PROBABLY BECAUSE THE KIDS LEFT ONE
INTERIOR LIGHT ON AGAIN. THEY KEEP CLAIMING IT'S MY FAULT FOR
LEAVING THE INTERIOR LIGHT ON OVERNIGHT, AND THAT THE SUBARU
TECHNOLOGY REPORTING SYSTEM HAS NOTHING ABOUT THIS. ISN'T THIS
AN ABSURD? UNACCEPTABLE THAT A SMALL LITTLE LIGHT CAN DRAIN
THE ENTIRE BATTERY POWER ONLY OVERNIGHT. I AM NOT TALKING
ABOUT HEADLIGHTS ON OVERNIGHT, IT'S ONLY ONE INTERIOR LIGHT...

AND SOMETIMES NOT EVEN THAT, JUST THE FACT THAT WE OPENED AND CLOSED THE DOORS WAY TOO MANY TIMES (EG WHILE CAMPING). THIS IS VERY IRRITATING AND I THINK THEY SHOULD HAVE THIS FIXED.

*************************************************************************

December 15, 2019
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11289138
Incident Date December 15, 2019
Consumer Location THORNTON, CO
Vehicle Identification Number 4S4BSENC3J3****
Vehicle: 2018 Subaru Outback
Summary of Complaint
I HAVE REPLACED THE BATTERY TWICE AND THE BATTERY IS STILL DEAD IF I DON'T DRIVE THE VEHICLE FOR MORE THAN 3 DAYS. OBVIOUSLY THERE IS A PARASITIC DRAIN. I DON'T HAVE AN OPTIONS OR ACCESSORIES INSTALLED THAT DID COME WITH THE VEHICLE WHEN PURCHASED.

*************************************************************************

January 24, 2020
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11301752
Incident Date January 24, 2020
Consumer Location WHITESTONE, NY
Vehicle Identification Number 4S4WMAAD4K3****
Vehicle: 2019 Subaru Ascent
Summary of Complaint
I PURCHASED VEHICLE IN DECEMBER 2018 FOR 2019 MODEL. THE ORIGINAL BATTERY ONLY LASTS SLIGHTLY OVER ONE YEAR. IT IS COMMON KNOWLEDGE THAT BATTERY OF A NEW VEHICLE NORMALLY LASTS FOR MORE THAN 5 YEARS. BATTERY RAN OUT IN LESS THAN 14 MONTHS IS VERY WEIRD AS I HAVE ONLY DRIVEN AROUND 2,500 MILES ONLY. I AM STRONGLY BELIEVE THAT THE BATTERY IS DEFECTIVE.

*************************************************************************

January 31, 2020
Components: ELECTRICAL SYSTEM, UNKNOWN OR OTHER
NHTSA ID Number: 11306313
Incident Date January 31, 2020
Consumer Location Unknown
Vehicle Identification Number 4S4WMAMDXK3****
Vehicle: 2019 Subaru Ascent

Summary of Complaint
2019 ASCENT WITH 6000 MILES GARAGE KEPT SUSTAINED COMPLETE
ELECTRICAL FAILURE AT GAS STATION REFILL. CAR DROVE AND
STARTED NORMALLY GOING TO STATION AND AFTER FILLUP FAILED TO
START.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

February 2, 2020
Components: ELECTRICAL SYSTEM
NHTSA ID Number: 11306550
Incident Date February 2, 2020
Consumer Location DEWITT, MI
Vehicle Identification Number 4S4WMAPD0K3\*\*\*\*
Vehicle: 2019 Subaru Ascent
Summary of Complaint
MY 2019 ASCENT WAS PARKED IN GARAGE OVERNIGHT. WENT OUT TO
CAR AND FOUND REAR TAILGATE WOULD NOT OPEN AND CAR WOULD
NOT START. BATTERY WAS DEAD. JUMPSTARTED CAR AND DROVE IT TO
THE STORE. WHEN I PARKED THE CAR IT WENT DEAD, CAR WOULD NOT
RESTART, AND WOULD NOT LOCK, TAILGATE WOULD NOT OPEN. HAD TO
GET ROADSIDE SERVICE TO COME OUT AND START CAR. TOOK CAR TO
DEALER AND THEY SAID THEY COULD NOT FIND ANYTHING WRONG BUT
DID REPLACE THE BATTERY. SEVERAL WEEKS LATER WHILE CAR WAS
PARKED AND LOCKED IN A STORE PARKING LOT I CAME OUT AND FOUND
THE REAR TAILGATE OPEN. NO ONE HAD PUSHED THE REMOTE TO OPEN
THE TAILGATE? TODAY I FOUND THE CAR PARKED IN THE GARAGE AND
THE TAILGATE WOULD NOT OPEN, THE CAR WOULD NOT START, AND THE
BATTERY WAS DEAD AGAIN. I COULD FIND NO REASON FOR THE
BATTERY TO BE DEAD AGAIN. THE CAR HAD BEEN DRIVEN NORMALLY
AROUND TOWN FOR THE LAST FEW DAYS. IT WAS PARKED IN THE
GARAGE. ALL THE DOORS WERE SHUT AND NO LIGHTS HAD BEEN LEFT
ON. THE CAR WAS PURCHASED IN JUNE 2019 AND HAS LESS THAN 6000
MILES ON IT PLUS THIS IS A NEW BATTERY. I AM CONCERNED ABOUT
DRIVING THE CAR AND BEING LEFT ON THE ROAD BY A DEAD BATTERY
OR COMING OUT AND FINDING THE REAR TAILGATE OPEN IN A PARKING
LOT.

Internet Complaints

https://www.subaruoutback.org/threads/uh-oh-dead-battery-syndrome.357618/

Discussion Starter • #1 • Jun 26, 2016

Well, I finally got hit with the premature dead battery that others have reported....and
with only an overnight stop in the garage and NO interior lights left on....NONE. I drove

the car yesterday on the highway for 20 minutes along with in town trips so the battery should have received and held a charge....

Two questions now before I call the dealer (50 miles away)...

1) Since the car is parked nose in, I cannot get our other car close enough to act as a power source and, to be honest, I'm not sure about doing what I would have called a normal boost......too many electronics in the 2015 OB to chance it, I think, until I know more.

I imagine that I'll have to break down (no pun) and get a trickle charger to slowly get the battery powered back up before taking it in for a new battery.........how inexpensively can I get away with a charger since this is honestly the first time in my life that I've had this dead car issue to deal with.....I usually replace batteries long before they go bad. I will almost never use the new charger again so I'd rather save money where I can......

Any WallyWorld (Walmart) chargers to stay away from or any idea about price because I'll probably NEVER use this thing again........

2) Dealer stop: I assume that the battery is a warranty item BUT is this a bad battery or otherwise? NO red warning lites before this AM when the car was almost dead and only the battery icon lit up...no starter motor, no gate opening, nada....

Will the car need to be reflashed by the dealer or, should I get the car started, is it safe to drive?

Sorry for the lack of using the search on the site BUT I need to get this taken care of asap..........normally, I enjoy reading thru the posts BUT we were on the way to the beach when the car crapped out on us........my beloved wife just wants the car to be fixed not watch me get distracted reading other threads.....which will happen for sure.

Thanks, all!!
Steve

#19 • Jun 26, 2016

The dealership is worthless. They tested it and said nothing was wrong and said there was nothing to do. I complained about how the battery failure made no sense. He kept repeating that everything tested fine.

I'm still pissed because I ended up missing an important event and was stuck about an hour from home during a massive storm (streets were flooded, but not a problem for the outback). Customer service gave me a coupon for $100 service/parts credit.

I might just buy a battery for some peace of mind.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

https://www.carcomplaints.com/Subaru/Outback/2018/electrical/dead_battery.shtml

#1
Dec 10 2017
Outback 3.6r
Automatic transmission 1,600 miles
Apparently Subaru has not fixed the problem w/ the Outback battery discharge. I was lucky to have my battery die in my garage and not out in the wilderness. And no, I did not accidentally leave the hatch light on overnight. Service manager at delearship was great, but no one mentioned this problem until I found it on this forum. Surprise, it's not an anomaly. My fix so far: replaced the new battery w/ another stronger battery. Will update if the problem reoccurs.
- D S., Stockton, US

#2
Nov 25 2017
Outback 2.5L
Automatic transmission 300 miles
Did not leave anything on (lights, etc.) that we can determine. Battery was then ruled "bad" at dealership. Had a similar problem 2017-12-20 (see that separate complaint).
- William B., Santa Rosa, US

#5
May 18 2018
Outback Limited 3.6r
Automatic transmission 6,000 miles
Fairly confident that I did not leave anything on (headlights, dome light, etc.), and I think it turns off the headlights automatically anyway, even if I had left them on. Car is in the garage - won't start, no lights, no locks, no horn, no nothing. Completely dead.
- Eve P., Bothell, WA, US

#6
Jul 14 2018
Outback 2.5i
CVT transmission750 miles
This is the FOURTH time I've had to have my car jump-started in the past two weeks. And that's just because I don't drive it constantly, but rather every couple of days for grocery shopping and whatnot. I do not leave lights on. I don't even drive at night, but I've checked anyway. I do not leave ANYTHING on. I've checked everything I could find and the guys doing the jumps (pros) have also checked.
I drove my car yesterday (after getting it jumped and letting it run for a good half hour or hour to charge up). It was dead THIS MORNING.
This is not an issue of leaving the car for weeks on end. It's an issue of 'this car has a faulty

electric problem and IT NEEDS TO BE FIXED'. Car will be going into the dealership for fixing soon, but meanwhile I'm having to call for a jump every time I want to use it for any reason.

I paid for Starlink. I hope they have to pay more for these jumps than I pay for my membership, when all's said and done, because they NEED to fix this problem for 2018 Outbacks. It's just not right to sell a car that can't function as sold.

#8
Oct 26 2018
Outback Touring 3.6L
CVT transmission 7,500 miles
For the second time in a month, I've had to call to get a dead battery jumped. The first time I just assumed I had left something on, but this time I know there was nothing on or running - it just went dead after only two days without starting it. I'll just keep calling for my covered road-side assistance until they get tired of it and fix it for me.
- Ken O., Huntsville, AL, US

#9
Dec 26 2018
Outback Premium 2.5i
CVT transmission 4,000 miles
I have a 2018 Subaru Outback 2.5i Premium still under warranty. I did experience the same problem, car not starting 3 days in a row. Either it needed recharge or jump start. Recently couple of days ago even after recharge after a stop to pickup coffee needed a Jump Start from a good Samaritan. A check at dealership, it revealed the battery fails the test, so they replaced it with a new battery. So get it checked and replaced. I heard from dealership service staff that some of 2018 Outback have battery problems, probably bad supplier of batteries to Subaru. Also the battery in Subaru doesn't have enough CCAs, it is only 400 CCA capacity. I am planning to replace this battery with a battery that has more CCAs that will stay alive for cold winters.
- Jag P., Herndon, US

#13
Mar 31 2019
Outback Touring 4 cyl
CVT transmission 9,658 miles
3rd Dead Battery March 31, 2019 Car parked in garage most of day. Needed to go out in early evening Sunday. Battery Dead. Called Triple A who jumped started car but this time before he jump started he showed me how the battery was leaking a little bit of acid, the battery showed 9.5 volts when he started charging and moved to 11.5 then 12.5 volts and the Alternator was "fluctuating". He said I should take the car into the Dealer have them check both the Battery and the Alternator - tell them that the Alternator "fluctuated" even tho his tester machine showed that the charging system was OK. He found that suspect. He also commented he had seen these problems before in 2018 Subarus and that the 490 Cold

Cranking rated battery was underpowered for all the electrical demands of these Subarus. Next morning Monday called Subaru service - bec they are overwhelmed with replacing airbags was told 1st appt would be in the following week. However I asked for and got same day while-you-wait-appointment to have battery and charging system checked. Service rep had someone - not dressed in sevice uniform take car away to test, test results report showed "Normal" just as Triple A guy's test had shown, but I asked service rep to take into account that there had been leaking battery acid and "fluctuating Alternator" And because there had been 2 episodes in 5 days could they please consider replacing the battery. Athough he was courteous he absolutely refused to consider replacing battery let alone replacing with a higher rated Cold Cranking battery.

Told him that I rely on my car starting and have to know that I can get to work and appointments on time and because of the unpredictability of the battery-electrical system I will have to try starting my car way in advance of when I would normally leave - to be able to call Triple A to jumpstart car and then having to drive around wasting time and gas; and when I have passengers in car being afraid that car won't start and will inconvenience more people than just myself. And that this is a safety and security issue.

What could he say to that? Was told there was nothing they could do, I would just have to put up with these incidents. I asked for his direct # to report/record these incidents as they occurred and he agreed to give me his tel# at work.

- Susan H., Santa Fe, NM, United States

#14
Mar 26 2019
Outback Touring 4 cyl
CVT transmission 8,000 miles
2nd Dead battery March 26, 2019. Car parked in garage for most of day. Needed to go out in early evening. Battery Dead, Called Triple A who jumped started car, checked charging system, battery voltage way down. suggested I should drive car for 30 - 45 min to recharge battery. Drove car around for 45min to an hour but afraid to stop to do the errand I originally had to do because I didn't want to turn off engine. 5 days later repeat incident.
Update from Apr 8, 2019Need to correct mileage: approx 9400miles
- Susan H., Santa Fe, NM, United States

#16
Mar 24 2019
Outback Limited 2.5L
CVT transmission 10,000 miles
Had 3 separate occasions where we had to have the Subaru jump started. Took it in to the dealership where they cannot find anything wrong with the battery or electrical system. They replaced battery just for good measure. Had to get it jumped again at an airport lot where we were gone for 4 days. But hey, nothing wrong with the car right?
- Henry S., Beaverton, US

#17
Apr 10 2019

Outback Limited 3.6L
Automatic transmission 8,000 miles
Battery has died twice. Last time down to one volt. Dealership (Camelback Subaru) would not replace battery because it still showed that it was charged.
Was told by "battery expert" if the charge is "1" or less, the battery will not take a full charge again. They WILL NOT replace it because it took a half charge.
Was told by dealership that these new cars need to be driven 18 miles often in order to keep the battery charged.
My car is dead. There is no solution.
There is obviously some electrical system that is draining the battery when the car is turned off.
The 1st time when the Subaru tech came out to recharge the battery, I was his 12th customer that morning. I drove it to dealership over 18 miles and it got a partial charge.
I purchased a trickle charger to give it a little boost.
I AM SCARED to drive it because it could die at anytime!
- 2018outback, Phoenix, US

#18
May 03 2019
Outback Limited 2.5L
CVT transmission 4,200 miles
The car has less than 5,000 miles on it and the battery has failed 6 times!. Mainly it seems to happen when the liftgate opens in the middle of the night. The dealer "can find nothing wrong" with the system and suggest that it has something to do with how I'm carrying my key fob. . So far I have tried 1. Not carrying key fob in pockets after coming in the house 2. Buying a rubber key fob "surround" 3. Purchasing a $120.00 Battery Charger from Amazon, which has saved me the last 5 times from having to get towed or waiting for roadside assistance. 4. Bought an RFID signal blocking pouch to put the key fob in. Last time failed was 2 weeks ago. Keeping fingers crossed that this last time will take care of it, but man, a lot of hassle to go through for a brand new $36,000 car!.
Also, the radio/GPS/Phone unit has failed on this car, currently waiting for replacement head unit. These two issues have apparently been going on for years with Outbacks and if I had researched them first, may never have purchased this car!.
I traded in a problem free 5 year old Nissan Pathfinder and am having regrets!
- Mark E., Chapel Hill, NC, US

#21
Jun 20 2019
Outback Limited 2.5L 4 cyl
Automatic transmission 28,000 miles
Wife returned to car after lunch to find rear hatch open and battery dead. This is incident #6 like this (but the first time the hatch has opened itself. After the second time I bought a TackLife jump start battery for $80 and have used it to "save myself" four times and counting. Dealership says our days of short runs don't keep the battery charged. I make a point of making a 20 minute run each day so that's not it. This car, and judging from the many similar complaints...this model in general has some electrical problem. They should

come with a jump battery kit

My plan for this car.... 1. ALWAYS carry a fully charged jump battery. The TackLife I got is easy to use and works great! 2. Keep the jump battery in the front or 2nd row...with battery dead the hatch won't open 3. Start keeping a log...where, when, what driving conditions preceded event, etc., etc. 4. Call the dealer and complain every time this happens. 5. Another forum mentioned how to start a case with Subaru.....do that. 6. At every service visit, demand that Subaru reimburse me for the Jump Batt which is now part of the car. 7. Warn potential buyers....Great Car....except for this one completely random GOTCHA!

- Steve D., Boise, US

#22
Sep 09 2019
Outback
Automatic transmission 19,000 miles
I have now experienced a dead battery 6 times in my 2018 Outback. Each time nothing was left on in the vehicle and it is parked inside a temperature controlled garage. The first time, the hatch opened during the night by itself (keys were nowhere near the vehicle as I live on the top floor of a high rise). Subsequent times it has occurred when the car hasn't been driven between 2-7 days. Dealer replaced the battery after the 4th time with the same size battery. It has happened twice since then. I've complained to the service department repeatedly that this is an issue and a simple Google search will pull up multiple complaints about it. I have been told repeatedly that the battery may die if it isn't driven enough. This is a ridiculous response. You should be able to go for 2-7 days without worrying that your battery will be dead! There is even a class action investigation now about it.
https://chimicles.com/2018-subaru-outback-dead-battery-class-action-investigation/
- Xan P., Denver, US

#23
NOV 13 2019
Outback Limited 3.2L V6
CVT transmission 3,500 miles
I went to my Subaru Outback to unlock and the battery was dead again. This is the second time my battery was dead and I had to get a replacement that cost me $180.
Thanks Subaru.
- brogonni, New York, US

36.     The Defect poses an unreasonable safety risk for Class Members and their

passengers.  As confirmed by the NHTSA and internet complaints, the Electrical Defect

often leaves owners and lessees stranded in various locations, including places where there is

no available assistance, and in any weather condition.  In fact, some Class Vehicle owners

were forced to take extreme measures to free their pets from crates that were locked in the

trunk of the vehicle.

**B.      SUBARU HAS EXCLUSIVE KNOWLEDGE OF THE DEFECT**

37.     Defendants had superior and exclusive knowledge of the Defect, and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiff and Class Members prior to their purchase or lease of the Class Vehicles.

38.     Plaintiff alleges that before Plaintiff purchased her vehicle and since 2014, if not before, Defendants knew about the Defect through sources not available to consumers, including pre-release testing data, early consumer complaints about the Defect to Subaru and their dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data contained in Defendant' warranty databases, as well as high reimbursement claims paid to Subaru dealers pursuant to warranty claims, aggregate data from Subaru dealers, including calls from Subaru dealers who directly reported to consumers' high failure rates and seeking assistance for repairs, among other internal sources of aggregate information about the problem.[2]

39.     Moreover, it is indisputable that Defendants were aware of the Defect at the time Plaintiff purchased her vehicles, yet did not disclose the defect to the Plaintiff and also failed to repair the defect prior to selling her the vehicle.

40.     The existence of the Defect is a fact that would be considered material to a reasonable consumer deciding whether to purchase or lease a Class Vehicle.  Had Plaintiff

---

[2] Plaintiff is informed and believes and thereon allege that Subaru of America, Inc., like other distributors in the United States and around the  world, during its normal course of business routinely  reports and communicates to the designer and manufacturer of the Class Vehicles, Subaru Corporation, warranty reimbursement claims and other internal information (e.g. consumer complaints and dealer technical contacts, reimbursement and failure rates, replacement sales data, among other internal information). Similarly, Subaru Corporation provides Subaru of America, Inc. and other distributors around the world with design and technical information concerning the Subaru vehicles.

and other Class Members known about the Defect while they were in the market for a vehicle, they would not have purchased the Class Vehicle or, at the very least, would have paid less for them to account for the need to monitor, plan for and repair the problem on an ongoing basis before the Defect could manifest.

41.     Reasonable consumers, like Plaintiff, expect and assume that a vehicle's electrical system is safe, will function in a manner that will not pose a safety hazard, and is free from defects.  Plaintiff and members of the proposed class also expect and assume that Subaru will not sell or lease vehicles with a known Defect, and will disclose any such defects to consumers when they learns of them.  They did not expect Subaru to conceal problems such as the Defect from them, to continually deny its existence, or that Subaru would refuse to bear the significant repair costs that become necessary to correct the problems resulting from defective electrical systems.

## C.     SUBARU HAS ACTIVELY CONCEALED THE DEFECT

42.     Defendants have been fully aware of the Defect in the Class Vehicles, but they have actively concealed the existence and nature of the defect from Plaintiff and members of the proposed class at the time of purchase, lease or repair and thereafter.  Specifically, Defendants failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

> (a)     any and all known material defects or material nonconformity of the Class Vehicles, including the defects relating to the electrical systems;
>
> (b)     that the Class Vehicles, including their electrical systems, were not in good in working order, were defective, and were not fit for their intended purposes; and
>
> (c)     that the Class Vehicles and their electrical systems were defective, despite the fact that Defendants learned of the Defect through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2014.

43.     Defendants have caused Plaintiff and Members of the Class to expend money at their dealerships to repair or replace the Class Vehicles' batteries that fail due to the Electrical Defect, despite Defendants' knowledge of the Defect.

44.     When consumers present the Class Vehicles to an authorized Subaru dealer for repair of the Electrical Defect, consumers are typically told that there is nothing wrong with their vehicle, they must have left something on that drained the battery, or that they must pay for the repair.

45.     To this day, Subaru still has not notified Plaintiff and the Class Members that the Class Vehicles suffer from a systemic defect that causes the electrical system to drain the battery while the vehicle is not in use.

46.     Defendants have caused Plaintiff and Class Members to expend money at their dealerships to diagnose, repair or replace the Class Vehicles' Electrical Defect, despite their knowledge of the Defect.

**D.      PLAINTIFFS' EXPERIENCES WITH THE DEFECT**

47.     In or about August 23, 2016, Plaintiff Burd, a New Jersey citizen, purchased a new 2017 Subaru Outback from a Subaru authorized dealer in Freehold, New Jersey. Plaintiff purchased this vehicle primarily for personal, family, or household purposes.

48.     Prior to purchasing the subject vehicle, Plaintiff considered Subaru marketing materials concerning the subject vehicle, including Subaru television commercials which failed to disclose that the subject vehicles suffered from the alleged Defect.  Plaintiff and her family also spoke with sales representatives about the vehicle at two different dealer locations.  However, like the other materials viewed by Plaintiff, these individuals with whom Plaintiff and her family spoke with did not disclose that the subject vehicles suffer

from the Defect alleged herein.

49.    Within six to nine months of ownership, the Defect manifested in Plaintiff's vehicle, when the vehicle's rear hatch failed to open while the vehicle was located at a parking lot in Eatontown, NJ.  It is believed the mileage on the odometer was less than 5000 miles.  The vehicle was then driven to a World Subaru dealer in Tinton Falls, NJ where the rear hatch suddenly began to work without warning.

50.    For the next seven to ten months, the Defect manifested in Plaintiff's vehicle repeatedly, when the vehicle failed to start on at least five to ten different occasions, including several times when the vehicle was parked at Plaintiff's child's school.  On each occasion, the dashboard lights would come on, but the vehicle would not start.  Typically, Plaintiff would attempt to start the car numerous times until the vehicle started, during which time Plaintiff would become frantic that she was stranded with her child.

51.    On or about October or November of 2018, Plaintiff brought her vehicle to World Nissan in Tinton Falls to complain about the Defect.  The dealer claimed to be unable to find a problem, but noted the battery remained under warranty and agreed to replace the battery free of charge.

52.    Nevertheless, Plaintiff's vehicle continued to suffer from battery drain.  In December of 2018, the car was left in the Newark Airport parking lot for approximately five days.  Upon returning to the vehicle, the battery was dead.  Plaintiff was required to call AAA to obtain a jump start from a tow truck.

53.    During the next nine months, the Plaintiff's vehicle continued to suffer from battery drain.  The car repeatedly failed to start, power windows would not open, etc.

54.    Plaintiff was forced to spend for approximately $65 to purchase a portable

booster capable of jump starting the vehicle.  The portable booster was used on several occasions.

55.     On or about September 23, 2019, Plaintiff brought her vehicle to Open Road Subaru to complain about the Defect and obtain additional services.  The dealer confirmed Plaintiff's complaint and replaced the battery in the vehicle.  The mileage on the odometer was approximately 54,720.  When specifically asked about the battery, a representative at the dealer used an expletive to describe it.

56.     Despite having the battery replaced twice within the first three years of owning the vehicle, the Defect has continued to manifest and Plaintiff constantly worries that her vehicle will not start.

57.     For example, during December of 2019, the vehicle was again left in a covered parking lot at Newark airport.  When Plaintiff's family returned to the vehicle after several days, the battery was dead.  In fact, the battery was so depleted, that the portable booster was, at first, unable to jump start the battery.

58.     At all times, Plaintiff, like all Class Members, has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

59.     If Plaintiff had known about the Defect prior to purchase, she never would have bought the vehicle.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action individually, and on behalf of a nationwide class, pursuant to Fed. R. Civ. Pr. P. 23(a), 23(b)(2), and/or 23(b)(3); specifically, the following Class and Sub-Class:

Nationwide Class:          All current or former owners and/or lessees who purchased or leased a Class Vehicle in the United States (the "Nationwide

Class").

New Jersey Sub-Class:  All current or former owners and/or lessees who purchased or leased a Class Vehicle in New Jersey (the "New Jersey Sub-Class").

61.     Excluded from the Nationwide Class and the New Jersey Sub-Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify the Nationwide Class and New Jersey Sub-Class definitions if discovery and/or further investigation reveal that they should be expanded or otherwise modified.

62.     There is a well-defined community of interest in the litigation and the Class is readily ascertainable.

63.     Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Departments of Motor Vehicles.

64.     Typicality: Plaintiff's claims are typical of the claims of the Class in that the Plaintiff, like all Class Members, purchased a Class Vehicle designed, manufactured, distributed, marketed, warranted, sold and leased by Defendants containing the Electrical Defect.  Plaintiff, like all Class Members, has been damaged by Defendants' misconduct in that she has incurred or will incur the cost of attempting to repair the Electrical Defect and mitigating its consequences.  Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to all Class Members.

65.    <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiff and the Class that predominate over any question affecting only individual Class Members.  These common legal and factual issues include the following:

(A)    Whether Class Vehicles suffer from a defect relating to the electrical systems;

(B)    Whether the defect relating to the electrical systems constitutes an unreasonable safety risk;

(C)    Whether Defendants know about the defect relating to the electrical system and, if so, how long Defendants have known of the defect;

(D)    Whether the defective nature of the electrical system constitutes a material fact;

(E)    Whether Defendants have a duty to disclose the defective nature of the electrical systems to Plaintiff and class members;

(F)    Whether Plaintiff and the other class members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

(G)    Whether Defendants knew or reasonably should have known of the defects relating to the electrical systems before it sold and leased class vehicles to class members;

(H)    Whether Defendants should be declared financially responsible for notifying all class members of the problems with the class vehicles and for the costs and expenses of repairing and replacing the defective electrical systems;

(I)    Whether Defendants are obligated to inform class members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective electrical systems;

(J)    Whether Defendants violated the New Jersey Consumer Fraud Act;

(K)    Whether, as a result of Defendants' omissions and/or misrepresentations of material facts related to the Defect, Plaintiff and class members have suffered ascertainable loss of moneys, property, and/or value; and

(L)    Whether Plaintiff and class members are entitled to monetary damages and/or other remedies, and if so the nature of any such relief.

66.    <u>Adequacy</u>:  Plaintiff will fairly and adequately protect the interests of the Class

Members.  Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to prosecute this action vigorously.

67.    Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

68.    In the alternative, the Class may be certified because:

(A)    The prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendants;

(B)    The prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(C)    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the members of the class as a whole.

<u>**VIOLATIONS ALLEGED**</u>

<u>**COUNT I**</u>
**BREACH OF EXPRESS WARRANTY**

69.     Plaintiff and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

70.     Plaintiff brings this cause of action against Subaru of America, Inc. only.

71.     Subaru of America, Inc. expressly warranted that the Class Vehicles were of high quality and, at a minimum, would actually work properly.  Subaru of America, Inc. also expressly warranted that they would repair or replace defects in material and/or workmanship free of charge if they manifested during the warranty period.  The length of Subaru of America, Inc.'s express warranty is 3 years/36,000 miles.

72.     The Electrical Defect is a defect in material and/or workmanship and therefore should have been repaired free of charge under the warranty.

73.     Subaru of America, Inc. breached this warranty by selling to Plaintiff and Class Members the Class Vehicles with known defects, including but not limited to the Electrical Defect.

74.     Subaru of America, Inc. further breached this warranty by failing to repair and/or replace Plaintiff's and other putative Class Members' electrical systems while the vehicles were still under warranty.  In fact, Plaintiff presented her vehicle to authorized Subaru dealer during the warranty period complaining of the Defect and despite such complaints failed to repair or replace the defective electrical under warranty, and instead simply replaced the battery which was merely how the Defect manifested itself, but not the actual defective part. As a result of these failure and the breach of warranty, Plaintiff was forced in incur additional expenses and has been left with a vehicle that is at risk of being dead and unable to start, at any

time.

75.     Subaru of America, Inc. knew of the Defect by 2014, if not before, and continues to have knowledge of the Defect and breaches of its express warranty, yet has intentionally failed to notify Plaintiff and Class Members.

76.     This intended failure to disclose the known Defect is malicious, and was carried out with willful and wanton disregard for the rights and economic interests of Plaintiff and Class Members.

77.     As a result of Subaru of America, Inc.'s actions, Plaintiff and Class Members have suffered economic damages including but not limited to costly repairs, loss of use of the vehicles, substantial loss in value and resale value of the vehicles, and other damages.

78.     Subaru of America, Inc.'s attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Subaru of America, Inc.'s warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the Defect so that they could avoid repairing it under warranty.

79.     The time limits contained in Subaru of America, Inc.'s warranty period were also unconscionable and inadequate to protect Plaintiff and Class Members.  Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Subaru of America, Inc..  A gross disparity in bargaining power existed between Subaru of America, Inc. and Class Members, and Subaru of America, Inc. knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

80.     Plaintiff and Class Members have complied with all obligations under the

warranty, or otherwise have been excused from performance of said obligations as a result of Subaru of America, Inc.'s conduct described herein.

81.     Plaintiff and Class Members are entitled to legal and equitable relief against Subaru of America, Inc., including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT II
## BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301 *ET SEQ.*

82.     Plaintiff and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

83.     Plaintiff brings this cause of action against Subaru of America, Inc. only.

84.     Plaintiff and the other Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

85.     Subaru of America, Inc. is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

86.     The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

87.     Subaru of America, Inc.'s express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

88.     Subaru of America, Inc. breached the express warranty by:

   a.     Extending a 3 year/36,000 mile warranty, thereby warranting to repair or replace any part(s) defective in material and/or workmanship at no cost to the owner or lessee;

   b.     Selling and leasing Class Vehicles with an electrical system that was defective in material and/or workmanship, requiring repair or replacement within the above warranty periods;

c.  Refusing to honor the express warranties by repairing or replacing, free of charge, the electrical system and instead, charging for repair and replacement parts.

89.  Subaru of America, Inc.'s breach of the express warranty deprived the Plaintiff and the other Class Members of the benefits of their bargains.

90.  The amount in controversy of the Plaintiff's individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

91.  Subaru of America, Inc. has been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiff and other Class Members brought their vehicles in for diagnoses and repair of the Electrical Defect.

92.  As a direct and proximate result of Subaru of America, Inc.'s breach of written warranty, Plaintiff and Class Members sustained damages and other losses in an amount to be determined at trial.  Subaru of America, Inc.'s conduct damaged Plaintiff and Class Members who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

### COUNT III
### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

93.  Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

94.  The New Jersey Consumer Fraud Act ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ."  N.J.S.A. 56:8-2.

95.     Plaintiff and Class Members are consumers who purchased and/or leased Class Vehicles for personal, family, or household use.

96.     Defendants engaged in unlawful conduct, made affirmative misrepresentations and material omissions, or otherwise violated the NJCFA.  Specifically, Defendants were aware that the Class Vehicles suffered from a common defect in the vehicle electrical systems resulting dead batteries and inability to start the vehicle, but purposefully failed to disclose this to Plaintiff and Class Members during the purchase of the vehicle or thereafter. Defendants failed to disclose the Defect with the knowledge that most Class Members will not discover the Defect until after the vehicle is purchased or leased.

97.     Defendants also engaged in unlawful conduct in violation of the NJCFA by making knowing and intentional omissions.  Defendants purposefully and knowingly failed to disclose the Defect in the Class Vehicles in order to secure the sale of these vehicles at a premium price and also to mislead owners during the limited warranty period to avoid having to perform their contractual duties under the warranty.

98.     Defendants did not fully and truthfully disclose to its customers the true nature of the inherent defect in the electrical system, which was not readily discoverable until after the vehicle was purchased or leased.  In fact, on the date Plaintiff purchased her vehicle, Defendants had acknowledged the defect to their dealers years earlier and described how to diagnose the defect, and yet Plaintiff's vehicles was never modified and she were never advised about the defect.

99.     Defendants intended that Plaintiff and all Class Members rely on the acts of concealment and omissions, so that they would purchase the Class Vehicles and not have the Defect remedied under warranty.

100.    As a result of Defendants' conduct, Plaintiff and Class Members have suffered an ascertainable loss.  In addition to direct monetary losses to repair and/or mitigate the Defect, Plaintiff and Class Members have also suffered an ascertainable loss by receiving less than what was promised.

101.    A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiff and the Class Members.  Had the Defect in the Class Vehicles been disclosed, consumers would not have purchased them, would have paid less for the Class Vehicles had they decided to purchase them, or would have presented their vehicles for repair of the Defect under warranty.

### COUNT IV
### COMMON LAW FRAUD

102.    Plaintiff and the Classes incorporate by reference each proceeding and succeeding paragraph as though fully set forth at length herein.

103.    Defendants made material misrepresentations and omissions concerning a presently existing or past fact.  For example, Defendants did not fully and truthfully disclose to their customers the true nature of the Defect in the Class Vehicles, which was not readily discoverable until after the vehicle was purchased or leased.  As a result, Plaintiff and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the Defect and all of the resultant problems, and also not present their vehicles to an authorized repair facility during the warranty period to have the Defect remedied at no cost.

104.    These omissions and statements were made by Defendants with knowledge of their falsity, and with the intent that Plaintiff and Class Members rely on them.

105.    Plaintiff and Class Members reasonably relied on these statements and omissions, and suffered damages as a result.

## COUNT V
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

106.     Plaintiff and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

107.     Every contract in New Jersey contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

108.     Defendants breached the covenant of good faith and fair dealing by, inter alia, failing to notify Plaintiff and Class Members of the Defect in the Class Vehicles, and failing to fully and properly repair this defect.

109.     Defendants acted in bad faith and/or with a malicious motive to deny Plaintiff and Class Members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## COUNT VI
### UNJUST ENRICHMENT

110.     Plaintiff and the classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein, with the exception of the contract causes of action above.

111.     This cause of action is plead in the alternative to the extent the Court determines that Plaintiff and/or the Classes do not have viable contract claims.

112.     As a direct and proximate result of Defendants failure to disclose the known Defect and material misrepresentations regarding the Defect, and the scope of the Warranty coverage in the Class Vehicles, Defendants have profited through the sale and lease of said vehicles.

113.    Additionally, as a direct and proximate result of Defendants' failure to disclose known defects and material misrepresentations regarding the Defect in the Class Vehicles, Plaintiff and Class Members have incurred substantial costs to attempt to repair the Defect, including the purchase of new batteries.  As a result of having to pay for repair at authorized dealerships and pay for replacement parts, Plaintiff and Class Members have conferred an unjust substantial benefit upon Defendants.

114.    Moreover, as a direct and proximate result of Defendants' failure to disclose Defect and material misrepresentations regarding the Defect in the Class Vehicles, Defendants have profited to the extent that Plaintiff and Class Members purchased and leased Defendants' vehicles, purchased certified parts directly from Defendants to repair the defects, and had to pay for repairs out of their own pocket that should have been covered under warranty.

115.    Defendants have therefore been unjustly enriched due to the Defect in the Class Vehicles through the use of funds that earned interest or otherwise added to Defendants' profits when said money should have remained with Plaintiff and Class Members.

116.    As a result of the Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that this Court:

a.    Certify the proposed Nationwide Class and/or New Jersey Sub-Classes, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

b.    Declare that Defendants are financially responsible for notifying all

Class Members about the Defect, recalling the Class Vehicles and/or extending their warranties to cover the Defect and reimbursing class members who have already paid to try to repair the Defect;

c. Enjoin Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and to remove and replace Plaintiff and Class Members' electrical systems with a suitable alternative product;

d. Require Defendant to comply with the various provisions of the New Jersey Consumer Fraud Act alleged herein and to make all the required disclosures;

e. Award Plaintiff and the Class compensatory, exemplary, treble, punitive and statutory damages, including interest, in an amount to be proven at trial;

f. Declare that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

g. Award of attorneys' fees and costs, as allowed by law and/or the statutes cited herein;

h. Award of pre-judgment and post-judgment interest, as provided by law;

i. Grant Plaintiff leave to amend the Complaint to conform to the evidence; and

j. Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated:  March 20, 2020

By:    */s/ Matthew R. Mendelsohn*
Matthew Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone:  (973) 228-9898
Facsimile: (973) 228-0303

Todd S. Garber (pro hac vice forthcoming)
Bradley F. Silverman (pro hac vice forthcoming)
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
445 Hamilton Avenue
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561

## LOCAL CIVIL RULE 11.2 CERTIFICATION

I hereby further certify that to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**MAZIE SLATER KATZ & FREEMAN, LLC**
Attorneys for Plaintiff


*/s/ Matthew R. Mendelsohn*
MATTHEW R. MENDELSOHN

Dated:  March 20, 2020

EXHIBIT A

**ATTENTION:**
GENERAL MANAGER  ☐
PARTS MANAGER  ☐
CLAIMS PERSONNEL  ☐
SERVICE MANAGER  ☐

IMPORTANT - All Service Personnel Should Read and Initial in the boxes provided, right.
© 2014 Subaru of America, Inc.  All rights reserved.



**SUBARU**

QUALITY DRIVEN® SERVICE

## SERVICE INFORMATION

| | | |
|---|---|---|
| **APPLICABILITY:** All Models | **NUMBER:** | 07-85-14 |
| **SUBJECT:** Measurement of "Dark Current" (Parasitic Battery Draw) | **DATE:** | 06/09/14 |

## INTRODUCTION

This bulletin will provide the proper procedure for measuring Dark Current (parasitic battery draw) along with the specification for maximum allowable limits.  Customer concerns of batteries going dead over a period of time should be diagnosed using this procedure once any obvious contributing factors have been eliminated.

## SERVICE PROCEDURE / INFORMATION

**1- Vehicle Preparation**

- Before beginning this procedure, the vehicle's battery must be fully charged and in peak operating condition.  If needed, charge the battery fully using the MidTronics GR8 or replace it if your diagnosis determines necessary.  A battery in poor condition or in need of charge will likely have an adverse effect on the accuracy of the dark current draw test results.
- The battery posts and cable ends must be free of corrosion, dirt, sealer and in good condition.
- Be sure to record the customer's radio station pre-sets and navigation system favorites (if applicable) as they will be lost during the test along with any seat memory settings.  **DO NOT** use an aftermarket 9-volt memory retention device in the power outlet to retain any ECU memory.
- Disconnect or remove any aftermarket (non-OEM) electrical accessories or equipment.
- Install the back-up power supply fuse then, (if applicable) using the SSMIII, confirm the Body Integrated Unit (BIU) is set "Market Mode".
- Using a short piece of wire, make a jumper lead to connect to the negative battery post as shown in the photo sequence below.  Once in place and twisted tightly around the battery post, reconnect the negative battery cable.  (16 ga. wire was used for this bulletin.)





*Continued...*

**CAUTION: VEHICLE SERVICING PERFORMED BY UNTRAINED PERSONS COULD RESULT IN SERIOUS INJURY TO THOSE PERSONS OR TO OTHERS.**

Subaru Service Bulletins are intended for use by professional technicians ONLY. They are written to inform those technicians of conditions that may occur in some vehicles, or to provide information that could assist in the proper servicing of the vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do the job correctly and safely. If a condition is described, DO NOT assume that this Service Bulletin applies to your vehicle, or that your vehicle will have that condition.

**SUBARU OF AMERICA IS ISO 14001 COMPLIANT**

ISO 14001 is the international standard for excellence in Environmental Management Systems. Please recycle or dispose of automotive products in a manner that is friendly to our environment and in accordance with all local, state and federal laws and regulations.

 

- Leaving the hood open, start the engine then position all the electrical switches as specified in the chart below.

| Electrical System | Control Switch Position |
|---|---|
| Headlights | ON or AUTO |
| Fog lights (if equipped) | ON |
| Wipers (Front and Rear) | On or Low Speed |
| Audio and Navigation system (OEM) | ON |
| Rear window defogger | ON |
| Dome light | Door |
| Cargo area light | Door |
| Map light | OFF |
| Air conditioner (Auto models) | ON (AUTO) |
| Air conditioner (Manual models) | ON (Speed 1) |
| EPB (Electric Parking Brake) | ON |
| All other electric components (except   those items specified above). | OFF |

- After all the switches have been set according to the chart, shut off the engine and remove the ignition key.

- Leaving the hood open, exit the vehicle, making sure all the doors (including the rear gate if equipped) are fully closed. Lock all the doors and confirm all interior lights go off.

- On push-start vehicles, the smart key (remote) will need to be at least 10 feet away to allow the system to "go to sleep". **The smart key must remain away from the vehicle until testing has been completed.**

- From this point, allow 5 minutes for the electrical system to stabilize ("go to sleep") before proceeding with the actual dark current testing.

**IMPORTANT:**

The "window" for performing this test is only 20 minutes from the time the vehicle goes to sleep. After approximately 20 minutes, the ELCM (if equipped) testing begins and will have an effect on your test results.  Another option is to wait approximately 5 hours after vehicle shut-down to perform the test.  This will allow plenty of time for ELCM testing to complete and eliminates the 20-minute "window".

*Continued...*

**2- Test Procedure**

- Loosen the nut securing (but do not remove) the negative (-) battery cable to the battery post.

- Connect the positive (+) probe of your ammeter to the negative (-) battery cable terminal end.

- Connect the negative (-) probe of the ammeter to the exposed end of the jumper wire.



On vehicles with a battery sensor on the negative battery terminal, leave the terminal connected and connect a jumper lead to the bus bar area between the terminal end and the 12mm nut as shown below for the feed to the DVOM.  Once the DVOM is connected, remove the 12mm nut, the battery cable from the stud then perform the test.  After testing, re-torque the nut to 7.5 Nm (5.5 ft. lbs.).



*Continued...*

Make sure your ammeter is set to read Amperage and not Voltage.  (The red lead had to be moved from the Voltage and Ohm socket to the "A" socket on the meter used in the photos.)

- While keeping the ammeter probe in contact with the negative (-) battery cable terminal and the end of the jumper wire, remove the battery cable terminal end from the battery post.

- After the current reading stabilizes, read the value displayed on the ammeter.  (On push-start models, if the current reading on the ammeter continues to fluctuate, the smart key may be too close to the vehicle which will prevent the vehicle from going to sleep.)



- The Dark Current reading shown here is .032 A or 32 mA.

**The maximum allowable average dark current draw is 70mA.*** If the measured dark current draw exceeds 70mA, begin diagnostics by removing fuses to isolate circuits one at a time while closely monitoring the ammeter reading for a corresponding decrease.  Once a circuit (or circuits) has been identified, continue with normal electrical diagnostics of that circuit to determine the source of the current draw.

*While 70mA is the maximum allowable average dark current draw, this does not mean a vehicle exhibiting an unusual current draw will always exceed 70mA. In some cases, a vehicle with less than a 70mA draw may be experiencing an unusual current draw.  It is recommended whenever possible, a like comparison vehicle be used to benchmark the vehicle which has a reported unusual current draw.

- When repairs are complete, always be sure to reset the customer's radio station presets and (if equipped) navigation system favorites before releasing the vehicle.

# EXHIBIT B

**ATTENTION:**

GENERAL MANAGER ❑
PARTS MANAGER ❑
CLAIMS PERSONNEL ❑
SERVICE MANAGER ❑

IMPORTANT - All Service Personnel Should Read and Initial in the boxes provided, right.

© 2017 Subaru of America, Inc.  All rights reserved.

 SUBARU

QUALITY DRIVEN® SERVICE

## SERVICE BULLETIN

| | |
|---|---|
| **APPLICABILITY:** 2015-2017MY Legacy and Outback<br>2015-2017MY WRX<br>2017MY Forester | **NUMBER:** 11-174-17R<br>**DATE:** 06/15/17<br>**REVISED:** 08/08/17 |

**SUBJECT:** Reprogramming File Availability for: DTC P05A0- Battery Discharge after Repeated Short-Trip Driving High Engine Idle RPM After Depressing Clutch Pedal

**INTRODUCTION:**

This bulletin announces the availability of reprogramming files to optimize the ECM and address the following customer concerns:

- Check Engine light coming on (with DTC P05A0 stored in memory).
- Potential battery discharge (dead battery) after repeated periods of short-trip driving.
- A high (or "hanging") engine RPM after depressing the clutch pedal (Forester only).

**PRODUCTION CHANGE INFORMATION:**

The new ECM logic was incorporated into production starting with the following VINs:

| Vehicle / Model | Starting VIN |
|---|---|
| 2017MY Legacy 2.5L CAL Spec. | H*066602 |
| 2017MY Legacy 2.5L FED Spec. | TBD |
| 2017MY Outback 2.5L CAL Spec. | H*410208 |
| 2017MY Outback 2.5L FED Spec. | TBD |
| 2017MY Legacy 3.6L | H*066607 |
| 2017MY Outback 3.6L | H*410212 |
| 2017MY Forester | TBD |

*Continued...*

**CAUTION: VEHICLE SERVICING PERFORMED BY UNTRAINED PERSONS COULD RESULT IN SERIOUS INJURY TO THOSE PERSONS OR TO OTHERS.**
Subaru Service Bulletins are intended for use by professional technicians ONLY. They are written to inform those technicians of conditions that may occur in some vehicles, or to provide information that could assist in the proper servicing of the vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do the job correctly and safely. If a condition is described, DO NOT assume that this Service Bulletin applies to your vehicle, or that your vehicle will have that condition.

**SUBARU OF AMERICA, INC. IS ISO 14001 COMPLIANT**
ISO 14001 is the international standard for excellence in Environmental Management Systems. Please recycle or dispose of automotive products in a manner that is friendly to our environment and in accordance with all local, state and federal laws and regulations.

**PACK FILE APPLICABILITY:**

The table below identifies what conditions are addressed with these reprogramming files according to the model year / vehicle:

| Model Year / Vehicle | These Files Reprogram the ECM for: |
|---|---|
| 2015-17MY Legacy & Outback 2.5L | P05A0 & New Charging Logic |
| 2015-17MY Legacy & Outback 3.6L | New Charging Logic |
| 2015-2017MY WRX 2.0 DIT | New Charging Logic |
| 2017MY Forester 2.5L 6MT | New Charging Logic & Hanging Engine RPM |

| Model | PAK File Name | New ECM Part Number | Old ECM Part Numbers | Decription Keyword | New CID Number |
|---|---|---|---|---|---|
| 2015MY Legacy & Outback 2.5 CAL | 22765AF36F.pak | 22765AF36F | 22765AF36A, B, C, D & E | 125D1DDC | EB4GA02C |
| | 22765AK16D.pak | 22765AK16D | 22765AK16A, B & C | 27B363BE | EB4GA02c |
| 2015MY Legacy & Outback 2.5 FED | 22765AF35F.pak | 22765AF35F | 22765AF35A, B, C, D & E | 81045551 | EB4GA02B |
| 2016MY Legacy & Outback 2.5 CAL | 22765AJ14C.pak | 22765AJ14C | 22765AJ14A & B | 63801358 | EB4I312C |
| 2016MY Legacy & Outback 2.5 FED | 22765AJ15C.pak | 22765AJ15C | 22765AJ15A & B | 91C57C1D | EB4I312B |
| 2017MY Legacy & Outback 2.5 CAL | 22765AK48D.pak | 22765AK48D | 22765AK48A, B & C | 5128F599 | EB4I503C |
| 2017MY Legacy & Outback 2.5 FED | 22765AK50D.pak | 22765AK50D | 22765AK50A, B & C | DC04AF72 | EB4I504B |
| 2015MY Legacy & Outback 3.6 FED/CAL | 22765AF45D.pak | 22765AF45D | 22765AF45A, B & C | FEB8E52F | DB4GA01D |
| 2016MY Legacy & Outback 3.6 FED/CAL | 22765AJ17B.pak | 22765AJ17B | 22765AJ17A | 61949565 | DB4I311D |
| 2017MY Legacy & Outback 3.6 FED/CAL | 22765AK31C.pak | 22765AK31C | 22765AK31A & B | 8B2BA880 | DB4I502D |
| 2015MY WRX 2.0 DIT 6MT FED | 22765AG238.pak | 22765AG238 | 22765AG230, 1, 2, 3, 4, 5, 6 & 7 | 3D970152 | LF75402S |
| 2015MY WRX 2.0 DIT CVT FED | 22765AG248.pak | 22765AG248 | 22765AG240, 1, 2 ,3 ,4 ,5 ,6 & 7 | 4A63E929 | LF75402T |
| 2016MY WRX 2.0 DIT 6MT FED | 22765AH613.pak | 22765AH613 | 22765AH610, 611 & 612 | 09FC6D63 | LF75402H |
| 2016MY WRX 2.0 DIT CVT FED | 22765AH623.pak | 22765AH623 | 22765AH620, 621 & 622 | AD45B5E1 | LF75402G |
| 2017MY WRX 2.0 DIT 6MT FED | 22765AK382.pak | 22765AK382 | 22765AK380 & 381 | E0946E06 | LF79101P |
| 2017MY WRX 2.0 DIT CVT FED | 22765AK392.pak | 22765AK392 | 22765AK390 & 391 | FD25ED3F | LF79101N |
| 2017MY Forester 2.5 6MT | 22765AH852.pak | 22765AH852 | 22765AH850 & 851 | AEF0D961 | EB4L012W |

*Continued...*

**SERVICE PROCEDURE:**

- Reprogram the ECM following the normal FlashWrite procedure.

Subaru of America, Inc. (SOA) highly recommends connecting the Subaru Midtronics GR8 Diagnostic Battery Charger to the vehicle and utilizing the Power Supply Mode feature anytime a vehicle control module is being reprogrammed.  Follow the procedure as outlined in document GR8-1100 on STIS for use of the GR8's Power Supply Mode:

- Confirm all electrical loads such as lights, audio, HVAC, seat heaters, and rear defroster are all switched **OFF** before setting up for Power Supply Mode.
- Select the correct battery type (Flooded, AGM or AGM Spiral).
- Select the CCA which matches the vehicle's battery (**NOTE:** OE and replacement batteries have different CCA ratings.  Always confirm the battery rating before proceeding.)
- If the "Charge Battery" **WARNING** appears, the battery **MUST** be charged before attempting reprogramming.
- **DO NOT** connect the DSTi or SDI until the GR8 Power Supply mode has completed its battery test mode and the Charging Voltage has dropped to a steady 13.5 Volts on the display.
- If the GR8 "beeps" or the Status Light flashes, a diagnostic charge should be performed on the battery before proceeding further.
- Once Power Supply Mode reaches a steady 13.5 volts, connect the DSTi or SDI to the OBD connector and initiate the reprogramming process.
- Amperage will fluctuate based upon the vehicle's demand for power.  **NOTE:** If the voltage rises beyond 14V while programming is in process, the procedure will abort. This can indicate a need to test or charge the vehicle battery before any further attempt at programming.

**IMPORTANT:**

This information is applicable to the Midtronics GR8 Diagnostic Battery Charger **ONLY**. It does not apply to any other brand / type of "generic" battery charger whatsoever.  **ONLY** the GR8 and its Power Supply Mode feature has been tested and approved by SOA.

Once the GR8 is connected to the vehicle, **as long as the battery is fully charged**, it takes less than 3 minutes to boot-up the charger, select Power Supply Mode, and have the battery voltage stabilized and ready for reprogramming.

**REMINDER:**  If the GR8 indicates the vehicle's battery must be charged, charge the battery using the GR8 before proceeding to reprogram the vehicle.

**NOTE:**  Control module failures as a result of battery discharge during reprogramming are not a matter for warranty.  Should any DTCs reset after the reprogramming update is performed, diagnose per the procedure outlined in the applicable Service Manual.

*Continued...*

**WARRANTY / CLAIM INFORMATION:**

For vehicles within the Basic New Car Limited, an applicable Emission Warranty period or covered by an active Subaru Added Security Classic or Gold plan, this repair may be submitted using the following claim information:

| Labor Description | Labor Operation # | Fail Code | Labor Time |
|---|---|---|---|
| MFI OBDII ECM Reprogramming | A455-288 | UPG-48 | 0.4 |

**IMPORTANT:  Always** note the original Calibration Identification number (CID) the vehicle came in with on the repair order **before** reprogramming and, make sure to list the **NEW** CID for any newly-installed programming (as confirmed from the actual control module **AFTER** installation). The **NEW** CID **MUST** also be noted on the repair order as this information is required for entry in the Miscellaneous Detail field during claim submission.

**NOTE:**  The pack file listings provided in this bulletin are the latest available at the time of publishing.  Updates are often released thereafter without revision to the original bulletin.  For this reason, it is critical to always have the latest version of Select Monitor software installed on your system.  You can confirm if a later version is available by entering the CID listed in this bulletin into FlashWrite.  If a newer CID is shown as available in FlashWrite, reprogram using that file.

**IMPORTANT REMINDERS:**

- SOA strongly discourages the printing and/or local storage of service information as previously released information and electronic publications may be updated at any time.
- Always check for any open recalls or campaigns anytime a vehicle is in for servicing.
- Always refer to STIS for the latest service information before performing any repairs.

# EXHIBIT C

**ATTENTION:**

GENERAL MANAGER ☐
PARTS MANAGER ☐
CLAIMS PERSONNEL ☐
SERVICE MANAGER ☐

IMPORTANT - All
Service Personnel
Should Read and
Initial in the boxes
provided, right.

© 2017 Subaru of America, Inc.  All rights reserved.



**SUBARU**

QUALITY DRIVEN® SERVICE

## SERVICE BULLETIN

| | | |
|---|---|---|
| **APPLICABILITY:** | 2015-16MY Legacy and Outback | **NUMBER:** 11-176-17 |
| **SUBJECT:** | Reprogramming to Optimize ECM for Improved Battery Life | **DATE:** 11/16/17 |

### INTRODUCTION:

This bulletin announces availability of reprogramming files to optimize the ECM for control of battery charging functions.  Depending on vehicle use conditions, the battery state of charge value may differ slightly from the actual value.  The new logic will enhance charging system control and result in improved battery life.

### PRODUCTION CHANGE INFORMATION:

The new logic was incorporated at the start of 2017MY vehicle production.

### PACK FILE APPLICABILITY:

| Model | PAK File Name | New ECM Part Number | Old ECM Part Numbers | Decryption Keyword | New CID Number |
|---|---|---|---|---|---|
| 2015MY LEGACY / OUTBACK 2.5L FED SPEC. | 22765AF35F.pak | 22765AF35F | 22765AF35A, 35B, 35C, 35D & 35E | 81045551 | EB4GA02B |
| 2015MY LEGACY / OUTBACK 2.5L CAL SPEC. | 22765AF36F.pak | 22765AF36F | 22765AF36A, 36B, 36C, 36D & 36E | 125D1DDC | EB4GA02C |
| 2015MY LEGACY / OUTBACK 3.6L FED SPEC. | 22765AF45D.pak | 22765AF45D | 22765AF45A, 45B & 45C | FEB8E52F | DB4GA01D |
| 2016MY LEGACY / OUTBACK 2.5L FED SPEC. | 22765AJ14C.pak | 22765AJ14C | 22765AJ14A & 14B | 63801358 | EB4I312C |
| 2016MY LEGACY / OUTBACK 2.5L CAL SPEC. | 22765AJ15C.pak | 22765AJ15C | 22765AJ15A & 15B | 91C57C1D | EB4I312B |
| 2016MY LEGACY / OUTBACK 3.6L FED SPEC. | 22765AJ17B.pak | 22765AJ17B | 22765AJ17A | 61949565 | DB4I311D |

*Continued...*

**CAUTION: VEHICLE SERVICING PERFORMED BY UNTRAINED PERSONS COULD RESULT IN SERIOUS INJURY TO THOSE PERSONS OR TO OTHERS.**
Subaru Service Bulletins are intended for use by professional technicians ONLY. They are written to inform those technicians of conditions that may occur in some vehicles, or to provide information that could assist in the proper servicing of the vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do the job correctly and safely. If a condition is described, DO NOT assume that this Service Bulletin applies to your vehicle, or that your vehicle will have that condition.

**SUBARU OF AMERICA, INC. IS ISO 14001 COMPLIANT**
ISO 14001 is the international standard for excellence in Environmental Management Systems. Please recycle or dispose of automotive products in a manner that is friendly to our environment and in accordance with all local, state and federal laws and regulations.

**SERVICE PROCEDURE:**

- Reprogram the ECM following the normal FlashWrite procedure.

Subaru of America, Inc. (SOA) highly recommends connecting the Subaru Midtronics GR8 Diagnostic Battery Charger to the vehicle and utilizing the Power Supply Mode feature anytime a vehicle control module is being reprogrammed.  Follow the procedure as outlined in document GR8-1100 on STIS for use of the GR8's Power Supply Mode:

- Confirm all electrical loads such as lights, audio, HVAC, seat heaters, and rear defroster are all switched **OFF** before setting up for Power Supply Mode.
- Select the correct battery type (Flooded, AGM or AGM Spiral).
- Select the CCA which matches the vehicle's battery (**NOTE:** OE and replacement batteries have different CCA ratings.  Always confirm the battery rating before proceeding.)
- If the "Charge Battery" **WARNING** appears, the battery **MUST** be charged before attempting reprogramming.
- **DO NOT** connect the DSTi or SDI until the GR8 Power Supply mode has completed its battery test mode and the Charging Voltage has dropped to a steady 13.5 Volts on the display.
- If the GR8 "beeps" or the Status Light flashes, a diagnostic charge should be performed on the battery before proceeding further.
- Once Power Supply Mode reaches a steady 13.5 volts, connect the DSTi or SDI to the OBD connector and initiate the reprogramming process.
- Amperage will fluctuate based upon the vehicle's demand for power.  **NOTE:** If the voltage rises beyond 14V while programming is in process, the procedure will abort. This can indicate a need to test or charge the vehicle battery before any further attempt at programming.

**IMPORTANT:**
This information is applicable to the Midtronics GR8 Diagnostic Battery Charger **ONLY**. It does not apply to any other brand / type of "generic" battery charger whatsoever.  **ONLY** the GR8 and its Power Supply Mode feature has been tested and approved by SOA.

Once the GR8 is connected to the vehicle, **as long as the battery is fully charged**, it takes less than 3 minutes to boot-up the charger, select Power Supply Mode, and have the battery voltage stabilized and ready for reprogramming.

**REMINDER:**  If the GR8 indicates the vehicle's battery must be charged, charge the battery using the GR8 before proceeding to reprogram the vehicle.

**NOTE:**  Control module failures as a result of battery discharge during reprogramming are not a matter for warranty.  Should any DTCs reset after the reprogramming update is performed, diagnose per the procedure outlined in the applicable Service Manual.

*Continued...*

**WARRANTY / CLAIM INFORMATION:**

For vehicles within the Basic New Car Limited, an applicable Emission Warranty period or covered by an active Subaru Added Security Classic or Gold plan, this repair may be submitted using the following claim information:

| Labor Description | Labor Operation # | Fail Code | Labor Time |
|---|---|---|---|
| MFI OBDII ECM Reprogramming | A455-288 | UPG-48 | 0.4 |

**IMPORTANT:** **Always** note the original Calibration Identification number (CID) the vehicle came in with on the repair order **before** reprogramming and, make sure to list the **NEW** CID for any newly-installed programming (as confirmed from the actual control module **AFTER** installation). The **NEW** CID **MUST** also be noted on the repair order as this information is required for entry in the Miscellaneous Detail field during claim submission.

**NOTE:** The pack file listings provided in this bulletin are the latest available at the time of publishing. Updates are often released thereafter without revision to the original bulletin. For this reason, it is critical to always have the latest version of Select Monitor software installed on your system. You can confirm if a later version is available by entering the CID listed in this bulletin into FlashWrite. If a newer CID is shown as available in FlashWrite, reprogram using that file.

**IMPORTANT REMINDERS:**

- SOA strongly discourages the printing and/or local storage of service information as previously released information and electronic publications may be updated at any time.

- Always check for any open recalls or campaigns anytime a vehicle is in for servicing.

- Always refer to STIS for the latest service information before performing any repairs.