# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE SUBARU BATTERY DRAIN PROD. LIAB. LITIG. | No. 1:20-cv-03095-JHR-MJS |

## JOINT CERTIFICATION OF MATTHEW D. SCHELKOPF, MATTHEW R. MENDELSOHN, AND ADAM E. POLK IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

We, Matthew D. Schelkopf, Matthew R. Mendelsohn, and Adam E. Polk (together, "Class Counsel"), hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     Matthew D. Schelkopf is a partner at Sauder Schelkopf, LLC ("Sauder Schelkopf") in Berwyn, Pennsylvania and another attorney of record for Plaintiffs and the Settlement Class. Mr. Schelkopf submits this certification based upon personal knowledge, in support of Plaintiffs' Motion for Final Approval of the Class Action Settlement, and if called to do so, could testify to the matters contained herein.

2.     Matthew R. Mendelsohn is a partner at Mazie Slater Katz & Freeman, LLC ("Mazie Slater") in Roseland, New Jersey and one of the attorneys of record for Plaintiffs and the Settlement Class.[1] Mr. Mendelsohn submits this certification based upon personal knowledge, in support of Plaintiffs' Motion for Final Approval of the Class Action Settlement, and if called to do so, could testify to the matters contained herein.

---

[1] Capitalized terms not otherwise defined herein have the same meanings attributed to them in the Parties' Settlement Agreement ("Settlement" or "SA").  (*See* ECF No. 72-2.)

1

3.      Adam E. Polk is a partner at Girard Sharp LLP ("Girard Sharp") in San Francisco, California and another attorney of record for Plaintiffs and the Settlement Class. Mr. Polk submits this submits this certification based upon personal knowledge, in support of Plaintiffs' Motion for Final Approval of the Class Action Settlement, and if called to do so, could testify to the matters contained herein.

4.      Attached hereto as **Exhibit A** is a true and correct copy of transcript excerpts from the deposition of Subaru's Director of Field Quality, John Gray, taken March 3, 2022.

## I.      Overview of the Class Action Settlement with Subaru

5.      Class Counsel Mazie Slater, Sauder Schelkopf, and Girard Sharp are highly experienced class action litigators who have vigorously represented their clients through this litigation—which included adversarial discovery and protracted mediation negotiations—and have a track record of successfully litigating automotive defect and consumer protection cases.  (*See* ECF No. 91-2, ¶¶ 26-28, 48, 60.)

6.      The Settlement is the product of arm's length negotiations by experienced counsel for both Parties that lasted approximately six months under the supervision of the Hon. Joel Schneider, U.S.M.J. (Ret.) of Montgomery McCracken Walker & Rhoads LLP.

2

7.     Before entering into the Settlement, Class Counsel independently analyzed the nature of the alleged defect that can cause a parasitic drain of Class Vehicle's battery power (the "Battery Drain Defect" or "Defect"), analyzed the Reflash being provided through the Settlement as well as Subaru's previous countermeasures to address the Defect, consulted with automotive engineering experts, studied government reports, and interviewed and collected documents from hundreds of class members. We also engaged in confirmatory discovery to assess Subaru's contention that the Reflash and other countermeasures substantially resolve the Defect, including by taking the deposition of Subaru's 30(b)(6) designee.

8.     Class Counsel's experience, the discovery we conducted, and our independent investigation into the alleged Defect enabled us to become familiar with the relative risks and rewards of the Settlement in relation to trial.

9.     Without the Settlement, the Parties likely would have continued adversarial discovery for many months. The claims at issue involve complex legal and technical issues, and continuing litigation would have been time consuming, expensive, and risky. By contrast, if approved, the Settlement will provide substantial and timely benefits for the Settlement Class without the delay, risk, or uncertainty of continued litigation.

10.    The Settlement achieved by the Parties has received overwhelming support from Settlement Class Members. Corresponding to the approximately

3

2,741,636 Settlement Class Vehicles, notices were mailed to 3,781,638 Settlement Class Members. Out of these millions of Class Members, Plaintiffs have received only 23 objection letters and 320 opt outs.  As compared to the number of individual notices, the objection percentage of 0.0006% and opt-out percentage of 0.008% represent miniscule fractions of the Settlement Class.

11.     Class Counsel believe that the attorneys' fees sought in this action are reasonable for the reasons set forth in Plaintiffs' Unopposed Motion for Attorneys' Fees, Expenses, and Service Awards. (ECF No. 91.)

12.     Given the recovery provided and the potential for an unfavorable trial, a denial of class certification, or a reversal on appeal, Class Counsel respectfully submit that this Settlement is fair, reasonable, and adequate.

## II.     Overview of Litigation and Legal Services Provided to the Class

13.     This action was brought by Plaintiffs Amy Burd, Walter Gill, David Hansel, Glen McCartney, Roger Baladi, Tamara O'Shaughnessy, Anthony Franke, Matthew Miller, Steven Stone, Howard Bulgatz, Mary Beck, David Davis, and Colin George on behalf of themselves and a putative class of all persons or entities in the

United States, who currently own or lease, or previously owned or leased, a Class Vehicle.[2]

14.     Plaintiffs alleged that the approximately 2.8 million Class Vehicles contain a Defect that causes parasitic drain of battery power. Plaintiffs further alleged that the resulting drain causes premature battery failure, an event that can leave drivers and their passengers stranded.

15.     Before filing this action, Class Counsel conducted an in-depth investigation into the alleged Battery Drain Defect. Our investigation included interviewing and reviewing documents from hundreds of prospective class members; studying various sources of consumer reporting; monitoring the National Highway Traffic Safety Administration ("NHTSA") website, on which consumers were reporting incidents related to the alleged defect; analyzing Subaru manuals and technical service bulletins that discussed the alleged defect; reviewing federal motor vehicle regulations regarding safety standards; identifying potential defendants; researching causes of action and other cases involving similar defects; and consulting with automotive engineering experts.

---

[2] The Class Vehicles include model years ("MY") 2015-2020 Subaru Outback, MY 2015-2020 Forester, MY 2015-2020 Legacy, MY 2015-2020 WRX, and MY 2019-2020 Ascent.

16.     The named Plaintiffs are residents of New Jersey, New York, California, Florida, Illinois, Michigan, Texas and Washington, and each Plaintiff alleged that his or her Class Vehicle experienced the Battery Drain Defect. The Complaint proposed certification of a Nationwide Class and subclasses of vehicle purchasers and lessees in the Plaintiffs' home states. Plaintiffs asserted claims for violations of various state consumer fraud statutes and the Magnuson-Moss Warranty Act, and also alleged claims for breach of express warranty, breach of the implied warranty of merchantability, common law fraud, and unjust enrichment.

17.     Certain of the Plaintiffs filed their initial complaint on March 20, 2020. After additional cases were filed, the Court consolidated all related cases and set a briefing schedule for the appointment of lead counsel. (ECF No. 9.) Counsel in the various related actions conferred and agreed to a stipulated leadership structure with the undersigned to serve as Interim Co-Lead Counsel, supported by an experienced Executive Committee and Liaison Counsel. (ECF No. 15.)

18.     On June 18, 2020, Plaintiffs filed their Consolidated Class Action Complaint. (ECF No. 18.) On August 3, 2020, Subaru moved to dismiss, and the Parties fully briefed that motion over the following months. (ECF Nos. 34, 38, 39, 42.) On March 31, 2021, the Court issued a 67-page Opinion granting in part and denying in part Subaru's motion. (ECF Nos. 46-47.) On April 28, Subaru answered the Consolidated Class Action Complaint. (ECF No. 50.)

19.     Since May of 2020, the Parties have engaged in various types of party and non-party discovery. Plaintiffs served initial disclosures, propounded and responded to interrogatories and requests for production of documents, reviewed documents produced by Subaru, and took the 30(b)(6) deposition of Subaru's Director of Field Quality, John Gray.

### III.     Settlement Negotiations, Terms, Notice, and Claims Administration

20.     On May 12, 2021, the Parties advised the Court that they intended to pursue mediation. The parties participated in a full-day mediation with the Hon. Joel Schneider, U.S.M.J. (Ret.) on July 7, 2021. They subsequently participated in several additional mediation sessions over the next four months. On multiple occasions, the Parties appeared to have reached impasse. Nonetheless, we persisted with our efforts to negotiate fair and adequate terms for the affected drivers.

21.     The Parties also exchanged confirmatory discovery subject to Federal Rule of Evidence 408. The documents obtained by Plaintiffs in that process contained Subaru's warranty claims analyses, sales data, the efficacy rates of various remedial measures, and additional information concerning the alleged Defect and its effects.

22.     On November 9, 2021, as a result of extensive negotiations under Judge Schneider's supervision, the Parties reached a settlement in principle to resolve Plaintiffs' class action claims.

23.     Before entering into the Settlement Agreement, Class Counsel assessed the Defect, examined government reports, consulted with respected automotive experts, surveyed class members regarding the efficacy of the measures Subaru had implemented to mitigate the defect, interviewed hundreds of class members, and reviewed their documents.

24.     On March 3, 2022, Class Counsel deposed Subaru's 30(b)(6) designee, John Gray, to assess Subaru's contention that it has resolved the alleged defect.

25.     The Settlement provides substantial benefits to the proposed Settlement Class. This class includes: All natural persons, who are residents of the continental United States, including Hawaii or Alaska, who currently own or lease, or previously owned or leased, a Settlement Class Vehicle originally purchased or leased in the continental United States, including Alaska or Hawaii. Excluded from the Settlement Class are (a) those claims for personal injury and/or property damage (claims for a Qualifying Battery Condition or Qualifying Battery Failure in a Settlement Class Vehicle are included regardless of whether they additionally experienced personal injury or property damage for which they do not make a claim; however, those additional claims for personal injury and/or property damaged shall be deemed excluded from the Settlement Class) and/or subrogation; (b) all Judges who have presided over the Action and their spouses; (c) all current employees, officers, directors, agents and representatives of Defendants, and their family members; (d)

8

any affiliate, parent or subsidiary of Defendants and any entity in which Defendants have a controlling interest; (e) anyone acting as a used car dealer; (f) anyone who purchased a Settlement Class Vehicle solely for the purpose of resale; (g) anyone who purchased a Settlement Class Vehicle with salvaged title and/or any insurance company who acquired a Settlement Class Vehicle as a result of a total loss; (h) any insurer of a Settlement Class Vehicle; (i) issuers of extended vehicle warranties and service contracts; (j) any Settlement Class Member who, prior to the date of the Settlement Agreement, settled with and released Defendants or any Released Parties from any Released Claims; (k) any Settlement Class Member that files a timely and proper Request for Exclusion from the Settlement Class; and (l) third party issuers.

26.     For the benefit of the Settlement Class Members, Subaru has agreed to provide several forms of valuable relief that address the issues raised by the litigation, including (a) a warranty extension for current owners and lessees, (b) reimbursements for out-of-pocket expenses, (c) compensation for extraordinary circumstances, (d) a free software update for qualifying Class Vehicles and ECM-related service for qualifying 2015 and 2016 Foresters, (e) payment for class notice and claims administration, and (f) payment of attorneys' fees, expenses and incentive awards according to Court order.

27.     The Settlement Agreement includes a comprehensive notice plan, to be paid for by Subaru and overseen by the experienced Settlement Administrator: JND

Legal Administration ("JND"). Class Counsel have regularly monitored and participated in the Notice and Administration process to ensure that JND is acting in accordance with the Settlement Agreement, and will continue these monitoring efforts after final approval.

28.     Subaru first identified Settlement Class Members through its records and provided that information to JND, which verified or updated the contact information through Experian, a third party that maintains and collects the names and addresses of automobile owners. JND then sent direct mail notice to the members of the Settlement Class.

29.     JND also performed an address search through the United States Postal Service's National Change of Address database to ensure use of the latest address information for Settlement Class Vehicle owners and lessees. If an individual Notice was returned as undeliverable, JND forwarded it where a forwarding address had been provided. If no forwarding address was provided, JND performed an advanced address search (e.g., a skip trace) and re-mailed undeliverable Notices if any new and current addresses were located.

30.     JND also emailed a notice containing a hyperlink to the Settlement Website and electronic versions of the Full Notice and Claim Form to the approximately 2.6 million Class Members for whom Subaru maintained an email address. In addition, JND established and maintains a dedicated settlement website,

https://www.subarubatterysettlement.com/, that posts the detailed Notice, Claim Form, Settlement Agreement, and other relevant documents. Class Counsel have included a link to the Settlement Website on their respective law firm's websites.

31.     The Notice approved by the Court provides Settlement Class Members with Class Counsel's contact information if they have any questions regarding the relief or how to submit a claim. Numerous Settlement Class Members have contacted Class Counsel with questions and to express their satisfaction with the Settlement.

32.     The deadline for opt-outs and objections was November 5, 2022. Out of a class of 3.7 million members, 23 individuals have objected to the Settlement (although only 17 are valid), and 320 have asked to be excluded from the class. Settlement Class Members who did not opt out have until 60 days after the Settlement becomes effective to submit a claim form.

## IV.   The 2015 and 2016 Foresters

33.     During the administration of the settlement, Counsel and the parties learned that the 2015 and 2016 Foresters do not have the programming that raised a charging logic issue in other Class Vehicles. As a result, the 2015 and 2016 Foresters cannot receive the same Reflash provided by the Settlement to other Class Vehicles.

34.     Counsel to Parties thereafter engaged in protracted discussions on providing substitute, equivalent relief to 2015 and 2016 Forester owners and lessees,

11

and those further negotiations delayed the administration of the Settlement. To facilitate resolution of these issues, the Parties requested, and the Court granted, extensions of time for filing Plaintiffs' Motion for Final Approval of the Class Action Settlement and continuances of the Final Fairness Hearing. (ECF Nos. 87, 88, 102, 103.)

35.     After extensive discussions on this issue, Subaru has agreed to provide these Settlement Class Members with a service related remedy equivalent to the Reflash that all other Class Members can obtain. The ECM-related service for the owners and lessees of 2015 or 2016 Foresters allows these Class Members to bring their vehicles to an authorized Subaru service center and have their vehicle's ECM checked for diagnostic trouble codes ("DTCs") related to the battery drain. If any related DTCs are located, such DTCs will be cleared and any repair required to address the failures related to the DTCs will be performed, free of charge. Subaru has confirmed the availability of this relief to Class Counsel in writing, and this addendum to the Settlement Agreement is fully enforceable, like the rest of the agreement.  Accordingly, any owner or lessee of a 2015 or 2016 Forester authorized to receive the free repair will be provided this relief.

36.     For any Settlement Class Member who owns or leases a 2015 or 2016 Subaru Forester and previously completed a Warranty Authorization Form, Counsel proposes that JND would send an e-mail notification that he or she may receive the

ECM-related service if they are experiencing a Qualifying Battery Condition as defined by the Settlement Agreement. Attached as **Exhibit 2** to the Proposed Final Order and Judgment is a copy of the proposed email notification JND will send.

37.   Counsel further proposes JND update the Frequently Asked Questions and Detailed Notice on the Settlement Website to notify class members of the ECM-related service individual who own or lease a 2015 or 2016 Subaru Forester may receive. Attached as **Exhibit 1** to the Proposed Final Order and Judgment is a copy of the proposed adjustments JND will make to the Settlement Website.

## V.   Claims Submitted to Date

38.   To date, Settlement Class Members have submitted over 30,000 claims for reimbursements worth more than $10 million in repair reimbursements.

* * *

39.   Based on the facts stated above and the points and authorities set forth in the accompanying motion, Plaintiffs respectfully request that the Court grant final approval of the proposed class action settlement.

We hereby declare under penalty of perjury that the foregoing is true and correct.  Executed on January 10, 2023.

By:      */s/ Matthew D. Schelkopf*
Matthew D. Schelkopf

13

By:        */s/ Matthew R. Mendelsohn*
           Matthew R. Mendelsohn


By:        */s/ Adam E. Polk*
           Adam E. Polk

# EXHIBIT A

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEW JERSEY

3    _____

4    IN RE SUBARU BATTERY              Case No.

5    DRAIN PRODUCTS LIABILITY          1:20-cv-03095-JHR-JS

6    LITIGATION

7    _____

8          VIDEOCONFERENCE DEPOSITION OF PERSON MOST

9       KNOWLEDGEABLE FOR SUBARU OF AMERICA - JOHN GRAY

10   DATE:            Thursday, March 3, 2022

11   TIME:            12:00 p.m.

12   LOCATION:        Remote Proceeding

13                    700 East Gate Drive

14                    Mount Laurel, NJ

15   REPORTED BY:     Arkady Sandoval, Notary Public

16   JOB NO.:         5112509

17

18

19

20

21

22

23

24

25

```
 1               A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS:
 3        JOSEPH B. KENNEY, ESQUIRE (by videoconference)
 4        MATTHEW D. SCHELKOPF, ESQUIRE (by
 5        videoconference)
 6        Sauder Schelkopf LLC
 7        1109 Lancaster Avenue
 8        Berwyn, PA 19312
 9        jbk@sstriallawyers.com
10        mds@sstriallawyers.com
11        (888) 711-9975
12        (610) 200-0581
13
14        MATTHEW R. MENDELSOHN, ESQUIRE (by
15        videoconference)
16        Mazie Slater Katz & Freeman LLC
17        103 Eisenhower Parkway, 2nd Floor
18        Roseland, NJ 07068
19        mmendelsohn@mskf.net
20        (973) 228-9898
21
22
23
24
25
```

Page 3

1          A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANTS SUBARU OF AMERICA, INC. AND

3    SUBARU CORPORATION:

4          NEAL WALTERS, ESQUIRE (by videoconference)

5          KRISTEN PETAGNA, ESQUIRE (by videoconference)

6          Ballard Spahr LLP

7          210 Lake Drive East, Suite 200

8          Cherry Hill, NJ 08002

9          waltersn@ballardspahr.com

10         petagnak@ballardspahr.com

11

12   ALSO PRESENT:

13         Terri Claybrook, Associate General Counsel at

14         Subaru of America (by videoconference)

15

16

17

18

19

20

21

22

23

24

25

Page 61

1   61?

2        A    Yes.  I -- I think I see it now.  Are you

3   talking about the very last time where it says,

4   "However, the output is insufficient for this

5   function"?

6        Q    That's correct.

7        A    Yes, it's referring back to the first

8   sentence where it talks about the alternator output.

9        Q    So is this state of charge issue that's

10  being discussed on this page -- is it a battery sensor

11  issue, primarily, or is it an issue with the actual

12  battery?

13       A    It's -- it's an issue with the control logic

14  in the engine control module.  The battery sensor is

15  merely sharing data on the -- the state of the

16  battery, the temperature, the state of charge.  That

17  information's being fed back to the engine control

18  module, which, in turn, controls when the alternator

19  is turned on to charge and turned off, and how much.

20  It can control, you know, not only on or off, but also

21  how much.  It could be anywhere from lightly charging

22  to, you know, fully charging.

23       Q    Okay.  If you flip over to the next page,

24  it's titled Countermeasure 1.

25       A    Okay.

1      Q     Which is -- the first sentence there states

2   that it's to improve the difference in SOC by changing

3   the supplemental charge control.  Do you see that?

4      A     Yes.

5      Q     And it looks like to me this is increasing

6   the lifespan of the battery.  Is that correct?

7      A     Not the lifespan, but it's increasing the

8   state of charge level that the battery's maintained

9   at.

10     Q     So what does the second graph at the bottom

11  of the page reflect then?

12     A     Yeah, that's -- what it's saying is by doing

13  that, you're going to be increasing the -- the

14  lifespan of the battery.

15     Q     And do you know what 70 to 100 refer to at

16  the bottom there?

17     A     Let's see.  It says, "Relation between the

18  average state of charge and repeat charge/discharge

19  life," where lifespan percentage is the left column

20  and the X axis is the state of charge.  So 70 to 100

21  would be the state of charge level.

22     Q     And was this countermeasure implemented?

23     A     Yes.

24     Q     If you flip over to the second page -- or

25  the next page in the slide deck discusses the second

Page 117

1      A     No, these are battery types.

2      Q     That's right.  I'm sorry.  Okay.  So under

3    "In Production," it lists a couple of different

4    things.  The first that I see is it references the

5    increase from 52.7Ah to 54.7Ah, which is what we just

6    discussed; right?

7      A     Yes, they're talking about doing a sort to

8    -- before the batteries are shipped to SIA, that they

9    would be sorted.  And only those with a 54.7Ah charge

10   would be accepted for shipment.

11     Q     Okay.  And it says that it was estimated

12   that that would be implemented at the end of July at

13   Clarios.  Is that right?

14     A     Yes.

15     Q     And that was implemented, to the best of

16   your knowledge?

17     A     Yes.

18     Q     Second, in the next one down it says that

19   it's considering recharging at a third-party.  Do you

20   know what that's referring to?

21     A     That's related to service parts that were

22   made by Clarios.  They were looking at ways to

23   potentially increase the supplied charge on the

24   replacement battery.

25     Q     And who would be the third-party recharging?

Page 138

1   Outback, it's the Clarios battery.  The LN2.

2        Q    Are those the only Subaru vehicles that

3   support that stop start functionality.  Is that

4   correct?

5        A    We currently have it on -- currently, we

6   have it on our -- some of our Crosstrek models.

7        Q    Okay.  But of the class vehicles,

8   specifically.

9        A    Correct.  Of the -- of the class vehicles,

10  yes.  It's Forester, and Legacy and Outback.  Ascent

11  does not have start stop.

12       Q    And neither would the WRX.  Is that right?

13       A    That's correct.

14       Q    All right.  The fourth item is new hardware

15  with modified software to prevent battery drain when

16  PRG is left open in Outback, Forester and Ascent.

17            So I know you mentioned the new hardware,

18  and we looked at the modified software.

19            What is the new hardware again, if you can

20  recall?

21       A    It -- the -- that particular module cannot

22  be reprogrammed on the vehicle.  So in order to get

23  the modified software, you actually have to replace

24  the physical module.  And that's why it's a new

25  hardware.

Page 139

1     Q   And I'm guessing the new module has the

2  modified software on it pre-programmed?

3     A   Yes, that's correct.

4     Q   And, again, the Legacy and the WRX do not

5  have the power rear gate.  Is that correct?

6     A   That's correct.  They have trucks.

7     Q   All right.  And the fifth is improved

8  pre-retail vehicle disciple and retailer testing

9  practices.  Do you see that?

10    A   Yes.

11    Q   And I believe we discussed this in one of

12  the prior QIM slide decks.  Is that correct?

13    A   Yes, that's the reinforcement of the

14  retailer storage and maintenance processes.

15    Q   Are there any other pre-retail vehicle

16  disciplines or retailer testing practices that have

17  been implemented that we have not discussed today?

18    A   No.

19    Q   So we have covered everything.  Okay.  All

20  right.  Could you flip to the last page in this for

21  me, which is --

22           MR. WALTERS:  Joe?

23           MR. KENNEY:  Sure.

24           MR. WALTERS:  Just so we are clear, I

25  think that the witness is probably focused on the

```
                                           Page 140
 1   pre-retail aspects of that.
 2                   We haven't, really, talked about the
 3   testing practices; right?  In terms of --
 4                   THE WITNESS:  Oh, the service --
 5   service testing.
 6                   MR. WALTERS:  Right.
 7                   THE WITNESS:  Oh, no.  We haven't
 8   talked about that.  No, we have not.
 9                   MR. WALTERS:  Right.
10                   THE WITNESS:  We're talking strictly
11   about prior to retailer delivery.
12                   MR. WALTERS:  Exactly.
13                   THE WITNESS:  Not servicing the
14   vehicle.
15                   MR. KENNEY:  Okay.
16   BY MR. KENNEY:
17       Q    Well, while we are on that subject, what has
18   changed about this Subaru retailer testing practices?
19       A    We've also been working with our retailers
20   to, again, reinforce using appropriate test practices
21   with the Midtronics test equipment to ensure that
22   they're applying it properly, and following up on the
23   result appropriately.
24                   There were some concerns that we found
25   through random audits of claims data compared with
```

 1    data received from the Midtronics testers that

 2    indicated there were some situations where retailers

 3    were testing the battery, and when it was found to be

 4    good recharge, they were not properly, fully

 5    recharging the battery.  They were just allowing the

 6    -- the test to complete.

 7         So we worked with those retailers that were

 8    identified to make sure that they understood they

 9    needed to create space and capacity to be able to

10    ensure that those batteries were fully recharged

11    before they were returned to the customer.

12         Q    Were retailers also just replacing batteries

13    without performing the testing?

14         A    That was another piece too, yes.  They

15    artificially inflated the claims information.  Again,

16    a lot of times -- we talked about previously in the

17    earlier presentations -- they talk about those low

18    mileage failures early in the life of the vehicle.

19    Shortly -- you know, within a year after delivery.

20    And in a lot of those cases there were retailers who

21    were not following proper policy.

22         You know, we -- we have a very generous,

23    goodwill policy that would allow them to replace those

24    batteries, and they could claim them under goodwill.

25    With no questions asked, we would -- we would take the

Page 142

1    claim.

2              But unfortunately, they were putting those

3    into warranty claim data for whatever reason, whether

4    it was misunderstanding of the policy or, you know,

5    I'm not sure what.  But mostly, misunderstanding of

6    the policy.

7              So that was also reinforced with them as

8    well to ensure that they are -- you know, they're

9    welcome to replace batteries, but not to put them

10   under warranty unless they are justified to be

11   replaced under warranty.  In other words, a -- a

12   failed battery test result.

13       Q    Other than those two tests that we just

14   discussed, is there anything else that was changed or

15   are those the primary ones?

16       A    Those were -- those were, really, the

17   primary ones.  I mean, there were some other very

18   small ancillary issues with improper testing where

19   they would test the battery as many times as it look

20   'til they got a failed result, or used a golden

21   battery to test and get a failed result that they

22   could claim under warranty.  But those were very rare

23   cases.

24       Q    What's a golden battery?

25       A    A battery that's already failed.  So they

Page 157

1    model years further reduced the claims rate to 3.16

2    percent in the 2019 and 1.17 percent in the 2020.  Is

3    that correct?

4         A    Yes, it is.

5         Q    And how would you categorize those failure

6    rates; 3.16 percent and 1.17 percent?

7              Would those be consistent with the failure

8    rates that SBR was seeing in the Panasonic batteries?

9         A    I would think so, yes.  I mean, the Forester

10   in '20 does have the Panasonic battery.

11        Q    All right.  Let's flip down to the WRX,

12   which is on page four of that exhibit.

13             So, again, just kind of looking at the data,

14   in aggregate it looks like the reflash -- the

15   reprogramming -- dropped the claims rate dramatically

16   down to probably an average of somewhere around 4

17   percent across the three different model years.  Would

18   you agree with that?

19        A    Yes, I would.

20        Q    Let's scroll down to the Ascent next.  So

21   under the Ascent it states that unlike the other class

22   vehicles, the 2019 to 2020 Ascent vehicles all

23   received the reflash and the higher capacity battery

24   in production.  The improvement in 2020 was masked by

25   the pandemic influences.  Do you see that?

Page 163

1        A     Yes, I do.

2        Q     And in the second sentence in references

3   economic pressures of the pandemic.  Do you know what

4   that's referring to?

5        A     Again, it -- it's talking about the relation

6   between the retailer and the customer and, again,

7   their desire to keep the customers happy.

8        Q     All right.  If you can scroll down to

9   interrogatory number three for me.

10       A     Okay.

11       Q     This asks Subaru to set forth with

12  specificity whether installing the larger capacity

13  batteries as compared to the OEM battery is a

14  component of repairing the defect in the vehicles.

15            And I take from its response that

16  incorporates its response to interrogatory number one

17  and number two that that answer is yes.  Is that

18  correct?

19       A     I would say it's definitely a component,

20  yes.

21       Q     Okay.  And why is that?

22       A     Because the additional capacity of the

23  battery will provide to help compensate for some of

24  the omissions already outlined.  The more extended

25  storage and just providing additional storage capacity

Page 164

1   within the battery to help reduce the possibility of

2   discharge, even in the event of inadvertently -- the

3   customer inadvertently leaving lights on and things

4   like that.  It's more likely to be captured and

5   recovered with the additional capacity in the battery.

6        Q    So if the primary countermeasure is the

7   reflash, I guess, this would be a secondary

8   countermeasure?

9        A    Yes.  I'd say -- I think you can say that.

10       Q    All right.  Can you turn to interrogatory

11  number four for me?

12            So this asks how the larger capacity battery

13  remedies the defect.  And here, again, Subaru

14  incorporates its previous responses.

15            Is there any reasons as to how the larger

16  capacity batteries remedies the defect that we have

17  not discussed yet today?

18       A    No, I don't believe so.

19       Q    All right.  Let's look at interrogatory

20  number five.  This asks for Subaru to list which class

21  vehicles received the large capacity batteries.

22            So I know we looked at the chart that you

23  had put together in Excel.  Other than the change that

24  we would make the Ascent, which would receive the 620

25  cold crank amp batteries now; are there any other